In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 02-2262

DOUGLAS A. BELL and TAMMY BELL,

*Plaintiffs-Appellants*,

*v.*

MIKE IRWIN and STEVEN CROW,

*Defendants-Appellees*.

---

Appeal from the United States District Court
for the Southern District of Illinois.
No. 00-cv-4078-JPG—**J. Phil Gilbert**, *Judge*.

---

ARGUED JANUARY 29, 2003—DECIDED FEBRUARY 25, 2003

---

Before COFFEY, EASTERBROOK, and KANNE, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*.  After a bout of drinking, Douglas Bell threatened his wife Tammy, who phoned the police for protection. By the time an officer arrived, the couple had made up and asked to be left alone. Forty minutes later, however, one of the neighbors called to tell the police that Tammy had been knocking on doors in search of safety. An officer quickly returned and found Tammy down the street; she asked for help and said that Douglas had "torn up" the couple's home. Douglas refused to admit the officer (or to come out) for discussion. The officer called the local police chief and initiated a

background check, which revealed that Douglas had a history of arrests for domestic violence, unlawful use of weapons, obstruction of justice, and drunk driving; Tammy told the officers that Douglas had attempted suicide. The police chief could not get Douglas to come out but did see through a window that he was holding several knives and a meat cleaver. Douglas drove one of the knives into a wall near the front door and threw several others into the yard in the direction of the police. He told the chief that he would kill any officer who entered and then kill himself; Douglas insisted that he had nothing left to live for, did not care about anyone else's life either, and would come out only "feet first."

Local police then called for help from the state police, which dispatched Lt. Steven Crow and Sgt. Mike Irwin. Negotiations continued to be unavailing, even after Douglas's father arrived and implored him to cooperate. Crow authorized Irwin to disable Douglas by firing bean-bag rounds from a shotgun if that proved to be necessary. Bean-bag rounds are designed to stun and inflict blunt trauma, knocking a person down but not penetrating the skin or damaging internal organs more severely than a kick or punch would. The record does not show just how dangerous bean-bag rounds can be, so it is hard to know whether they should be classified as "deadly force," see *Omdahl v. Lindholm*, 170 F.3d 730, 733 (7th Cir. 1999), but they are less lethal than bullets or buckshot. (With defendants' acquiescence, the district court treated them as a species of deadly force; we need not decide whether this is correct.)

Douglas opened the door and threatened to blow up his home using propane and kerosene in tanks immediately outside. Irwin saw Douglas lean toward a tank with what appeared to be a cigarette lighter; in response Irwin fired at Douglas's arm and torso. The first three rounds staggered but did not stop Douglas; a fourth brought him

down. Douglas was a moving target, and one round hit him in the head. Officers took him to the hospital; he arrived unconscious and was treated for injuries to the head and upper left arm. While Douglas was at the hospital, an Illinois State Police Crime Scene Investigator discovered a lighter on the ground outside the door of the home. One cannot be sure that it was in Douglas's hand when Irwin fired, but no other explanation for its presence has been adduced.

In this suit under 42 U.S.C. §1983, Douglas contends that he experienced a memory loss as a result of the bean-bag impacts; Tammy seeks compensation for loss of consortium. The Bells' theory is that Irwin violated the fourth amendment by using force that was excessive under the circumstances, and that Crow is culpable for failing to prevent Irwin from doing this. The constitutional inquiry is objective. See *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Lester v. Chicago*, 830 F.2d 706 (7th Cir. 1987). And it is implemented "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Police may use even deadly force if "the suspect poses a threat of serious physical harm, either to the officer or to others". *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). "[I]f the suspect threatens the officer with a weapon" (*ibid.*) that risk has been established. See also *Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1988) (en banc); *Ford v. Childers*, 855 F.2d 1271 (7th Cir. 1988) (en banc). Applying these principles to the evidence in this record, the district court granted summary judgment to the defendants.

Douglas acknowledges that he was armed with knives, drove Tammy out of their home, refused to emerge or admit police for discussion, held a knife to his throat while threatening suicide, and made a move toward the propane tank. He denies making explicit threats to kill the officers or ignite the propane—but he concedes that the

combination of drink and concussion has dimmed his memory of what occurred that evening. The district judge thought that, even resolving all factual disputes in plaintiffs' favor, what remains is enough to show that it was reasonable to use force to end the confrontation and avoid any risk that Douglas would injure himself or others. Like the district judge, we think that Douglas should have thanked rather than sued the officers. True, he suffered injury at their hands, but in his depressed and irrational state, aggravated by liquor, he might have done himself or others greater injury had they not intervened. It is easy in retrospect to say that officers should have waited, or should have used some other maneuver—these propositions cannot be falsified—but *Graham* makes it clear that the fourth amendment does not require second-guessing if a reasonable officer making decisions under uncertainty and the press of time would have perceived a need to act. The risks of intervention, unfortunately realized when one round hit Douglas in the head, still seem less than the risks of doing nothing. See also, e.g., *Pena v. Leombruni*, 200 F.3d 1031 (7th Cir. 1999).

The Bells' principal theme on appeal is that, however these things may appear to the police and federal judges, only a jury is empowered to determine whether the officers' conduct was reasonable. Plaintiffs seek to equate constitutional-tort litigation to common-law tort litigation, in which negligence is a matter of degree to be resolved by a jury even if all of the facts have been stipulated, provided that a reasonable argument may be made both for or against the view that the defendant was negligent. Here is where the phrase "constitutional tort" may mislead, for the Constitution is not a form of tort law. It creates legal rules. Permitting the jury freedom to determine for itself whether particular conduct was reasonable within the meaning of the fourth amendment would

introduce the *ex post* reassessment that *Graham* decried. Under the Constitution, the right question is how things appeared to objectively reasonable officers at the time of the events, *not* how they appear in the courtroom to a cross-section of the civilian community. *Ornelas v. United States*, 517 U.S. 690 (1996), holds that whether a search or seizure (other than one authorized by a warrant) is supported by probable cause is a question of law for the court of appeals, so that even the district judge's view receives no deference. The Justices distinguished the rules for ascertaining historical facts from the role of the appellate tribunal in applying principles of constitutional law to those facts. See also *Miller v. Fenton*, 474 U.S. 104 (1985) (same allocation for the question whether a confession is involuntary).

When material facts are in dispute, then the case must go to a jury, whether the argument is that the police acted unreasonably because they lacked probable cause, or that they acted unreasonably because they responded overzealously and with too little concern for safety. But when material facts (or enough of them to justify the conduct objectively) are undisputed, then there would be nothing for a jury to do *except* second-guess the officers, which *Graham* held must be prevented. Since *Graham* we have regularly treated the reasonableness of force as a legal issue, rather than an analog of civil negligence. See, e.g., *Smith v. Ball State University*, 295 F.3d 763, 770-71 (7th Cir. 2002); *Smith v. Chicago*, 242 F.3d 737, 743-44 (7th Cir. 2001); *Hebron v. Touhy*, 18 F.3d 421 (7th Cir. 1994); *Titran v. Ackman*, 893 F.2d 145 (7th Cir. 1990). This appears to be the accepted rule; the Bells do not cite, and we could not find, any post-*Graham* appellate opinion holding that the reasonableness of using force is a jury question even if no factual disputes require resolution. To the extent that *Llaguno v. Mingey*, 763 F.2d 1560, 1565 (7th Cir. 1985) (en banc), treated probable cause and deriva-

tively the reasonableness of police officers' conduct as matters indistinguishable from negligence in ordinary tort suits, it has been superseded by *Graham* and *Ornelas*, which stress that reasonableness is analyzed objectively, and as a matter of law. Judges rather than juries determine what limits the Constitution places on official conduct.

To say that police officers have acted within the bounds that the Constitution sets is not necessarily to say that they have acted wisely. States may choose to afford additional protections of personal safety and require the police to wait even when federal law permits them to act. If states create negligence-like rules, then by virtue of the seventh amendment they will be implemented by juries if the litigation occurs in federal court. When this case began, it included a state-law claim under the supplemental jurisdiction. But that claim has been abandoned, and there is no material dispute of fact that calls for a trial of the federal theory.

AFFIRMED

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*