**Alma PALMA and the Estate of Gregory Palma, Plaintiffs–Appellants,**

v.

**James EDWARDS and the Village of Downers Grove, Defendants–Appellees.**

No. 03–2019.

United States Court of Appeals, Seventh Circuit.

Argued May 20, 2004.

Decided June 22, 2004.

Keith J. Schneider, Schneider & Schneider, Arlington Heights, IL, for Plaintiff–Appellant.

James L. DeAno, Norton, Mancini, Argentati, Weiler & Deano, Wheaton, IL, for Defendant–Appellee.

Before COFFEY, ROVNER, and EVANS, Circuit Judges.

ORDER

Alma Palma and her son's estate sued the Village of Downers Grove and Downers Grove police officer James Edwards after Edwards fatally shot the son, Greg Palma. The plaintiffs claimed that Edwards used excessive force in shooting Greg, in violation of 42 U.S.C. § 1983, the Illinois Wrongful Death Act, 740 Ill. Comp. Stat. Ann. 180/1 (West 2004), and the Illinois Survival Act, 755 Ill. Comp. Stat. Ann. 5/27–6 (West 2004). A jury found for the defendants. The plaintiffs then moved for judgment as a matter of law or, in the alternative, a new trial, see Fed.R.Civ.P. 50(b), which the district court denied. The plaintiffs now appeal the district court's denial of their Rule 50(b) motion. Because they fail to show that no reasonable jury could have found in favor of the defendants, we affirm the district court's judgment.

On April 21, 1999, at roughly 5:00 p.m., the Downers Grove Police Department received a 911 call from a woman who lived in the downstairs apartment at 928 Maple. The caller reported that her upstairs neighbor, Greg Palma, was using a chainsaw to break into her apartment through the back door. The woman escaped from her apartment, and a stand-off between Greg and the police began. This was not Greg's first encounter with the Downers Grove police that day. In the middle of the afternoon, three Downers Grove police officers had attempted to talk to Greg at 928 Maple after a woman told police that Greg had threatened her life and followed her around town that morning. One of the officers, Nicholas Curcio, testified that during that earlier encounter Greg "was acting very irrationally, refused to come [outside], made a lot of off-the wall comments," so the officers had left 928 Maple "[i]n an effort to try not to inflame things any further."

When the standoff began the Downers Grove police enlisted the aid of a SWAT team from another jurisdiction. A negotiator with the SWAT team, Officer David Franklin, testified that he called Greg shortly before 6:00 p.m. to start negotiating his surrender. During the negotiations Greg pointed a rifle at several officers and told Franklin that he would shoot police officers if they did not move away from the house. Greg also told Franklin that he had wired propane tanks to explode if any officers came near the house, so Franklin called a bomb squad, also from an outside jurisdiction. Several times Franklin heard Greg running a chainsaw for 30 seconds, but Greg would not explain what he was doing with the chainsaw.

Officer Edwards testified that during the stand-off he was positioned in the backyard of the house next to 928 Maple and overheard Greg's threats to shoot police officers and blow up the house. Edwards was armed only with a handgun, so another officer who had to return to the police station left his AR–15 rifle with Edwards. Edwards had not been trained to use an AR–15, but the SWAT commander decided to allow him to use it because Edwards had been trained on the military version of the gun—the M–16.

Greg eventually agreed to surrender and told the police that he would exit the back of the house. While most of the officers were waiting in back for Greg, Officer Dominic Scalzetti was standing to the side of the house and saw an individual in dark clothing running from the side of 928 Maple toward the backyard. Edwards then saw a man running toward him from 928 Maple pointing a sawed-off shotgun at him. Edwards testified that he heard a gunshot and believed that the man—Greg Palma—had fired his weapon at the officer. In fact, however, while raising his rifle Edwards had accidentally pulled the

trigger and fired the shot he thought came from Greg's gun. Edwards then intentionally fired three shots at Greg as he was running toward him, two of which hit Greg. The testimony of two officers, and a bystander corroborated Edwards' testimony that Greg was running across the yard, pointing a gun at Edwards.

After Greg was shot, police officers did not immediately approach him because they were afraid he could be playing dead or might have explosives on him. Members of the bomb squad testified that they secured Greg's hands and turned him over in order to search for explosives. Greg was then pronounced dead. The defendants emphasized at trial that Greg Palma had told police he was going to surrender by exiting at the back of his house, but instead crawled through the crawlspace under the house and emerged on the side. The defendants claimed that Greg then ran across the back of the house with a sawed-off shotgun pointed at two officers, including Officer Edwards, so Edwards shot him in order to protect himself and prevent Greg from escaping.

The plaintiffs' challenge to the jury's verdict is premised on their belief that Greg Palma was handcuffed and in police custody before he was shot. The plaintiffs advance three reasons why they believe the jury was compelled to accept their theory of the case: (1) the medical evidence proves that Greg could not have been running when he was shot; (2) the defendants offered no evidence to counter Alma Palma's testimony that she was told that her son was handcuffed and in police custody; and (3) Greg could not have escaped from the house by crawling because he was physically "disabled."

We review the denial of a post-trial motion for judgment as a matter of law *de novo*. *See Appelbaum v. Milwaukee Metro. Sewerage Dist.,* 340 F.3d 573, 578 (7th Cir.2003). The standard governing a Rule 50 motion mirrors that employed in evaluating a summary judgment motion. *Reeves v. Sanderson Plumbing Prods. Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Looking to "all of the evidence in the record," *id.,* we ask whether "any reasonable jury could have reached the same conclusion," *Liu v. Price Waterhouse LLP,* 302 F.3d 749, 754 (7th Cir.2002).

In determining whether the intentional use of deadly force by a police officer is permissible under the Fourth Amendment, the jury must consider the totality of the circumstances. *See Scott v. Edinburg,* 346 F.3d 752, 756 (7th Cir.2003). If an officer has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or others, it is not unreasonable to prevent escape by using deadly force. *See Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). And we have held that if the suspect threatens the officer with a weapon, the risk of serious physical harm to the officer or others has been established. *See Bell v. Irwin,* 321 F.3d 637, 639 (7th Cir.2003). Under the Illinois Wrongful Death Act and Illinois Survivor Act, the jury must find that the defendants' conduct was willful and wanton in order to establish liability. *See Am. Nat'l Bank & Trust Co. v. City of Chicago,* 192 Ill.2d 274, 248 Ill.Dec. 900, 735 N.E.2d 551, 553 (Ill.2000).

The plaintiffs first argue that the jury's verdict was against the manifest weight of the evidence because, in the plaintiffs' view, the deposition testimony of the medical examiner, Dr. Teas, was inconsistent with the "medical evidence." The plaintiffs do not point us to any other medical evidence with which to compare Dr. Teas' deposition.

Dr. Teas stated that Greg Palma suffered two gunshot wounds: one bullet struck his upper left arm, and the other entered his back on the left side. The bullets traveled through Greg's body from left to right and were consistent with Greg being shot from the side. Dr. Teas stated that her examination showed that Greg had been shot from at least 18 inches away, but not further than 20 feet away. Dr. Teas testified that the two bullet wounds traveled a "relatively" straight line in Greg Palma's body. Dr. Teas concluded that the bullet wounds were consistent with Greg having been shot from the side while he was "running across the field of vision from the shooter."

The plaintiffs challenge this last conclusion on the assumption that Dr. Teas also "testified that for a person to be running when they're shot, there has to be an angle" to the bullet wound. According to the plaintiffs, then, Greg Palma could not have been running at Officer Edwards when he was shot because the straight paths the bullets took through his body demonstrate that he was shot while standing still. Despite the plaintiffs' contrary representation, however, Dr. Teas never stated that a bullet that strikes a running individual will always leave an angled wound. Dr. Teas explained that if she examined a body with bullet wounds entering the torso at substantially different angles, she could conclude that the victim had been running when shot because a person who is running may hunch over, causing their torso to be at an angle. Therefore, when the body is laid flat to be examined by a pathologist, the bullet wounds may appear to have been fired from different angles, but the angles are explained by the placement of the victim's chest, not the position of the shooter. The plaintiffs, at best, simply misunderstand Dr. Teas' testimony. Regardless, even if the jury could not have relied on Dr. Teas'

testimony to support its verdict, the jury still could have credited the testimony of several other witnesses that Greg was shot while running. Because the testimony of the medical examiner supports, rather than discredits, the testimony of the police officers, the plaintiffs' challenge to the jury's verdict on this ground fails.

The plaintiffs' second argument is even weaker. They contend that the jury's verdict should be overturned because there was uncontroverted evidence that Greg Palma was already handcuffed before he was shot. The only trial evidence supporting this theory came from Alma Palma, who testified that on the night of the shooting Deputy Chief Harrison told her "that her son ... was handcuffed in police safe custody and she could see him at the police station." The plaintiffs contrast this purported statement with the testimony of a bystander, a paramedic, a SWAT commander, and a member of the bomb squad, all of whom testified that they never saw Greg handcuffed. The plaintiffs thus surmise that, because none of these latter individuals saw Greg handcuffed after the shooting even though Mrs. Palma had been told that he was, the only plausible explanation is that Greg was handcuffed before the shooting.

But the plaintiffs ignore every other possibility. It is possible that Deputy Chief Harrison told Alma Palma that her son was in handcuffs because he had been informed that Greg was in custody but not told that Greg had been fatally shot. Another possible explanation is suggested by the testimony of a Downers Grove detective, who stated that Greg was handcuffed for "officer safety" after he was shot because "[h]e was armed, he had thrown weapons out the window, and he was supposedly in possession of explosives." Finally, it is possible that Mrs. Palma could have misunderstood Harrison's statement

or that it could have been distorted in her memory over time. On appeal the plaintiffs assert that Harrison was still working for the Downers Grove Police Department during the trial, but they did not call him as a witness to corroborate Mrs. Palma's testimony. The jury was presented evidence to support competing theories, and it resolved the issue in favor of the defendants, so we have no reason to disturb its conclusion. *See Appelbaum,* 340 F.3d at 581.

Finally, the plaintiffs argue that the jury's verdict was against the manifest weight of the evidence because Greg Palma was not physically capable of crawling underneath the porch for 30 feet and then running away from the house. The plaintiffs contend that it would have been impossible for Greg to escape in the manner the defense argued because 18 months before the shooting Greg had suffered a severe pelvic injury that required surgical reconstruction of his pelvis. The plaintiffs argue that the defendants' evidence of Greg's method of escape was so unbelievable that the shooting must have occurred in another way from the one described by the defense witnesses.

The plaintiffs, however, cite nothing in the trial record to support their argument. In contrast, the record contains the testimony of the woman who lived in the apartment below the Palmas, who stated that she had never seen Greg Palma limping, or exhibit difficulty walking up the stairs, and that her husband had helped Greg move a washer and dryer out of the basement. Several bystanders and police officers also testified that they saw Greg running across the yard on the night he was shot. Thus, the jury was presented with sufficient evidence to support a verdict consistent with the defendants' theory that Greg was physically capable of crawling underneath the house and running through the yard.

Because the record lends sufficient support to the jury's finding that the defendants did not use excessive force or shoot Greg Palma in a willful and wanton manner, we affirm the district court's denial of the plaintiffs' Rule 50(b) motion.