# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 07-2356/3066

_____

David Lash, Sr.,          *
                                   *

         Plaintiff - Appellant,     *

                                   *

David Lash, Jr.,          *

                                   *

         Plaintiff,              *

                                   *    Appeal from the United States

         v.                        *    District Court for the Eastern

                                   *    District of Missouri.

Michael Hollis, in his official and    *
individual capacity; Adam Swon, in    *
his official and individual capacity;   *
Anthony Bowne, in his official and    *
individual capacity; John Kirkpatrick,   *
in his official and individual capacity,   *

                                   *

         Defendants - Appellees.    *

_____

Submitted: March 14, 2008
Filed: May 13, 2008

_____

Before WOLLMAN, HANSEN, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

      Plaintiff David Lash, Sr., ("Lash Sr.") achieved partial success in a civil rights action involving injuries he sustained during an arrest. A jury awarded him $1,000 in damages, and the district court awarded him $10,616 in attorney fees. He now

appeals the fee award alleging error in the district court's determination of a reasonable fee. He also appeals the district court's denial of a motion for a new damages-phase trial. We affirm the denial of the motion for a new trial, but vacate the attorney fee award and remand for reconsideration of the fee award.

I. Background

Lash Sr.'s family members and neighbors restrained him and called police after he took a large amount of the prescription anti-seizure medicine Gabitril and started acting violently.[1] His family reported that he had taken 50–60 Gabitril pills in the prior 2–3 days and that he claimed to have taken "like 15 pills and smoked some joints" before becoming violent. Family members and neighbors restrained Lash Sr. by pushing him into a plaster wall and then holding him down against the floor. They pushed him into the wall with sufficient force to create an indentation in the wall.

When police arrived, the officers noticed that Lash Sr. was bleeding from the mouth. Lash Sr. was combative, and at one point he threw an officer off of his back. In attempting to subdue Lash Sr., one officer applied a choke or strangle hold to Lash Sr.; another officer sat on Lash Sr.'s legs; and a third officer restrained Lash Sr. by holding his arms behind his back with a baton. When Lash Sr. was restrained on his stomach on the floor, Officer Michael Hollis shocked him with a Taser six times by using the Taser in drive-stun mode and pressing the Taser into his back. Hollis also shocked Lash Sr.'s son, Lash Jr., once with the Taser. The officers then took Lash Sr. to a hospital where he received treatment. Photos of Lash Sr. en route to the hospital show numerous fresh bruises on his back that his family claim were not present before officers arrived.

_____

[1]Lash Sr. had severed the tip of his finger in a construction accident. To alleviate his pain, he smoked marijuana, took over-the-counter pain pills, and took "what was described to him as prescription pain medication belonging to another person later learned to be Gabitril an anti-seizure medication."

At the hospital, Lash Sr. was uncooperative and combative and had to be sedated. The treating physician admitted Lash Sr. for a Gabitril overdose and determined that Lash Sr. was suffering from acute onset kidney failure. The treating physician put him on dialysis, and this treatment eventually restored his kidney function. The treating physician diagnosed Lash Sr.'s kidney failure as having been caused by rhabdomyolysis, a condition that may occur when muscle tissue breaks down and releases substances into the bloodstream that overwhelm the kidneys. Rhabdomyolysis reportedly can be caused by many factors, including but not limited to drug use or trauma by electrical charge or physical force.

Plaintiffs Lash Sr. and Lash Jr. subsequently sued many parties, including Hollis and the three officers who physically restrained Lash Sr. Plaintiffs alleged battery and civil rights violations. Plaintiffs also sued a municipal defendant and the Taser manufacturer, Taser International, but Plaintiffs moved to dismiss the claims against the municipal and corporate defendants with prejudice prior to trial. Plaintiffs sought damages in the form of lost wages, physical and emotion pain and suffering, and medical expenses, including over $65,000 in dialysis and kidney-related medical expenses.

Plaintiffs offered Christopher Long, Ph.D. as an expert on the issue of whether the Taser discharges were a cause of Lash Sr.'s rhabdomyolysis. Defendants offered their own expert who sought to opine that an overdose of Gabitril caused rhabdomyolysis. Defendants moved to exclude Long's testimony. Before the trial, the district court granted Defendants' motion to exclude the Taser portion of Long's testimony, finding: (1) Long had no experience with Tasers or Taser injuries; (2) he had no knowledge or experience regarding the Taser at issue in this case; and (3) he appeared to have based his expert opinion solely on the review of one scholarly article.

At trial, Plaintiffs again attempted to place before the jury the issue of the Taser as a cause of Lash Sr.'s rhabdomyolysis. Plaintiffs subpoenaed Lash Sr.'s treating physician, a kidney specialist, who opined that the prescription drug Lash Sr. had taken did not cause kidney failure. The treating physician also testified generally that muscle trauma was the likely cause of rhabdomyolysis and the eventual kidney failure in Lash Sr. The treating physician's testimony as to causation was as follows:

> Q. All right. And in your assessment, did you diagnose what was the cause of the injuries that resulted in the acute kidney failure to Mr. Lash?
>
> A. My diagnosis was Rhabdomyolysis. Rhabdomyolysis is a condition where a muscle is injured and it releases a pigment from inside the muscle in the bloodstream that goes into the kidneys as it filters the blood and causes acute kidney failure.
>
> Q. And did you diagnose what you believed caused the Rhabdomyolysis?
>
> A. I believe some sort of trauma caused the Rhabdomyolysis.
>
> Q. And can you explain to me what trauma?
>
> A. Trauma could be any physical blow or burn, electrical charge trauma.

At the close of Plaintiffs' case, Defendants moved for judgment as a matter of law on the issue of whether the Taser discharge caused Lash Sr.'s kidney failure. Plaintiffs argued that the treating physician's testimony was adequate to create a jury question as to whether Lash Sr.'s kidney failure was a secondary injury caused by the Taser. The district court disagreed with Plaintiffs and granted Defendants' motion. Referencing its earlier ruling on the <u>Daubert</u>[2] motion and the exclusion of Long's testimony, the district court stated, "The Taser causation is not in this case." The court ultimately concluded:

---

[2]<u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993).

I did not hear you ask anything about 'to a reasonable degree of medical certainty.' You put him on as a treating physician, which may be why you didn't ask, but we don't have an expert who–any other expert or any other medical person whom you qualified as an expert capable of testifying to that. So I think on that basis, the kidney damage is out of this case for insufficient evidence.

Regarding the claims by Lash Sr., the jury returned defense verdicts for the three officers who used physical force against Lash Sr., but returned a verdict for Lash Sr. against Hollis based on Hollis's use of the Taser. The jury awarded Lash Sr. $1,000 in damages on his claim against Hollis. The jury returned defense verdicts as to all claims by Lash Jr.

Lash Sr. moved for a new damages-phase trial, arguing that the issue of the Taser as a cause of kidney-failure and evidence of over $65,000 in kidney-related medical bills should have been submitted to the jury. The district court denied his motion, and he appeals.[3] Lash Sr. submitted a claim for attorney fees, seeking approximately $250,000. The district court granted fees in an amount substantially below this request. We discuss additional details regarding the fee award below.

II. Discussion

    A. Motion for New Damages-Phase Trial

"We review a district court's evidentiary rulings . . . and denial of a new trial for abuse of discretion, according substantial deference to the district court's rulings." Ferguson v. United States, 484 F.3d 1068, 1074 (8th Cir. 2007). Here, the jury found liability only as to Defendant Hollis and not as to any other defendants. Further, Lash

---

[3]Lash Sr. also challenges the exclusion of certain testimony regarding emotional distress. We have considered Lash Sr.'s arguments on this issue, find them to be without merit, and do not discuss them further.

Sr. moved for a new trial only as to the damages phase; he argued it was improper to preclude the jury from considering the Taser as a cause of his kidney failure and assessing damages for his kidney-related medical expenses.

Given the jury's specific finding that Hollis was the only defendant liable to Lash Sr., and given Lash Sr.'s limited request for relief, we must focus on evidence tending to show a causal relationship between Hollis's actions and Lash Sr.'s kidney failure. Beyond Hollis's use of the Taser, there was no evidence that Hollis struck or otherwise exercised violence against Lash Sr. Accordingly, we must determine whether the jury could have found by preponderant evidence that Hollis's action in discharging the Taser induced rhabdomyolysis in Lash Sr. or whether the district court improperly excluded evidence that would have created a triable question of fact on this issue. We believe the district court correctly determined that the evidence was insufficient for such a showing, and the district court did not err in excluding any evidence that might have assisted Lash Sr. on this point. In light of these conclusions, we find no abuse of discretion by the district court in denying the motion for a new damages-phase trial.

There was no expert testimony or other evidence tending to show that the Taser discharge in this case could have induced rhabdomyolysis or contributed to Lash Sr.'s rhabdomyolysis. The treating physician's testimony was general in nature. He stated that kidney-damaging rhabdomyolosis was caused by "some sort of trauma" that could have been "any physical blow or burn, [or] electrical charge trauma." The treating physician did not testify specifically that the shocks applied by Hollis were the cause or partial cause of the rhabdomyolysis, what amperage or voltage would be required to induce rhabdomyolysis, or whether the Taser at issue was capable of such a release.

Further, even if the treating physician had specifically opined that the Taser discharges caused rhabdomyolysis in Lash Sr., the physician offered no explanation of a differential diagnosis or other scientific methodology tending to show that the

Taser shocks were a more likely cause than the myriad other possible causes suggested by the evidence. Family members and neighbors had subjected Lash Sr. to physical trauma prior to arrival of the officers, as shown by the dented wall and Lash Sr.'s bleeding mouth. The officers whom the jury found not liable had used force on Lash Sr. Also, Lash Sr. recently had taken large doses of Gabitril in combination with marijuana. Given these facts, any claim that the Taser induced rhabdomyolysis would appear to be based on mere speculation.

Lash Sr. argues, nevertheless, that we should excuse this absence of proof and treat the present case as a *res ipsa*-type case under the Missouri "sudden onset" doctrine. Lash Sr. argues that because Hollis purportedly was fine before the officers arrived, but was bruised and suffered kidney failure after the altercation with the officers, it would have been permissible to let the jury infer that the Taser discharges caused the rhabdomyolysis. See, e.g., Ridpath v. Pederson, 407 F.3d 934, 935 (8th Cir. 2005) (describing Missouri's sudden onset doctrine and stating, "The most obvious cases for . . . the doctrine . . . are those where a person is involved in a violent accident and sustains [an obvious injury such as] a broken bone, or an open wound."). This argument fails for a number of reasons. First, there was no evidence to show that Lash Sr.'s kidneys were in good working order immediately prior to the officers' arrival. There was, however, evidence that he had taken an overdose of an anti-seizure medicine in combination with marijuana and was acting in an unusual and violent manner before police arrived, suggesting a possible medical problem at the outset. Second, this argument ignores the evidence regarding violence against Lash Sr. before the police arrived that resulted in a dent in a plaster wall and left Lash Sr. bleeding from the mouth. Further, this argument ignores the fact that the physical trauma to Lash Sr. from the three officers other than Hollis could have induced rhabdomyolysis, and the jury found their application of force to Lash Sr. to be non-actionable. In this instance, then, the evidence suggested multiple possible causes for Lash Sr.'s injuries rather than one alleged event preceding the harm, as would be required for application of the sudden onset doctrine.

More importantly, though, rhabdomyolysis is not an obvious result of the application of force, and, therefore, is not the sort of injury or condition known by lay persons to flow naturally from a physical or electrical charge trauma. Missouri's sudden onset doctrine is only appropriate for use in cases involving injuries whose cause might be obvious to a lay person. See id. at 936 (refusing to apply the doctrine where a battery was alleged to have aggravated a pre-existing intestinal disorder because aggravation of such a disorder was not an obvious result within the scope of a lay person's understanding). Given the multiple possible causes of Lash Sr.'s kidney failure, and the complex and uncertain chain of causation involving muscle degradation and the release of substances to overwhelm the kidneys, it would not have been appropriate to permit jurors to sort through causation without specific and detailed expert testimony.

To the extent Lash Sr. ties his motion for a new trial to the earlier exclusion of his expert witness, Christopher Long, Ph.D., we find that the district court acted well within its discretion in excluding the witness. Long had no experience with Tasers, Taser injuries, or the specific Taser at issue in this case. Further, even if it had been improper to exclude Long, there is no suggestion, in an expert's report or other offer of proof, that testimony from Long would have remedied the omissions in Lash Sr.'s case.

B. Attorney Fees

Regarding the fee award, Plaintiffs submitted a fee request for about $250,000. Through "line item" strikes as to specific time entries and a substantial downward adjustment to the hourly rates for the plaintiffs' attorneys and a paralegal, the district court brought the fee amount down to about $80,000. The court then cut this figure in half to $40,000 based on the fact that there were two plaintiffs, but only one of the plaintiffs prevailed. The court then further divided this resultant amount by four to

-8-

about $10,000 based on the fact that the single prevailing plaintiff prevailed against only one of the four defendants at trial.

We find no abuse of discretion in the "line item" cuts that brought the fee award from $250,000 to $80,000. These cuts represent a typical exercise of discretion where the district court is better positioned than the appellate court to understand what services were reasonable and what hourly rates were appropriate in the relevant market. The court classified certain hours as related exclusively to the claims against Taser International or the municipal defendants (whom Lash Sr. agreed to dismiss with prejudice prior to trial). The court struck other hours as being insufficiently explained in the affidavits and other evidence.

The cuts from $80,000 to $10,000, however, were "global" cuts rather than "line item" cuts. The district court based these global cuts on a characterization of Lash Sr.'s degree of success in this case that involved sequential reductions of 50% and 75% based solely on the number of successful and unsuccessful claims. Such a method is, in general, not appropriate. See Hensley v. Eckerhart, 461 U.S. 424, 435 n.11 (1983) ("We agree with the . . . rejection of a mathematical approach comparing the total number of issues in the case with those actually prevailed upon. Such a ratio provides little aid in determining what is a reasonable fee in light of all the relevant factors." (internal quotation and citation omitted)). Had each plaintiff's claim against each defendant involved entirely separate legal questions or depended on separate issues of fact, such a method for assessing the reasonableness of fees might have been permissible. See Emery v. Hunt, 272 F.3d 1042, 1046 (8th Cir. 2001) ("When a plaintiff has prevailed on some claims but not on others, the plaintiff may be compensated for time spent on unsuccessful claims that were related to his successful claims, but not for time spent on unsuccessful claims that were 'distinct in all respects from his successful claims.'" (quoting Hensley, 461 U.S. at 440)). We cannot determine from the present record, however, whether the district court considered the relationship between the plaintiffs' successful and unsuccessful claims, or considered

that common questions of law and fact existed among the claims by the two plaintiffs against the four defendants. See Emery, 272 F.3d at 1046 ("Claims are related, and hence deserving of compensation, if they 'involve a common core of facts' or are 'based on related legal theories.'" (quoting Hensley, 461 U.S. at 435)).

The resultant award of approximately $10,000, based on the hourly rates set by district court, added up to 50.55 hours by one attorney, 12.04 hours by a second attorney, 8.38 hours by a paralegal, and 9.0 hours by a third attorney, for a total of about 80 hours. On its face, it seems this fee award may represent an inadequate amount of time to investigate, prepare, brief, and try a civil rights case involving multiple defendants, complex issues of causation, and actual physical injuries. That is not to suggest a district court is bound to award a fee commensurate in scope with what a prevailing party might have paid on a non-contingent basis. See Hensley, 461 U.S. at 434 ("The product of reasonable hours times a reasonable rate does not end the inquiry."). Rather, "[t]he most important factor in determining what is a reasonable fee is the magnitude of the plaintiff's success in the case as a whole." Jenkins v. Missouri, 127 F.3d 709, 716 (8th Cir. 1997) (en banc); see Hensley, 461 U.S. at 436 ("[T]he product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith.").

The actual monetary damages awarded to Lash Sr. were only $1,000, and it is possible the district court viewed this award as a nominal amount when compared to the relief the two plaintiffs initially sought. See, e.g., Ways v. Lincoln, Neb., 274 F.3d 514, 517 (8th Cir. 2001) (affirming a First Amendment case in which "[t]he court granted . . . a permanent injunction and nominal damages of $1.00, as well as $5,693.10 in attorney fees and $630.14 in costs"); Burks v. Siemens Energy & Automation, Inc., 215 F.3d 880, 882–83 (8th Cir. 2000) ("'Although the "technical" nature of a nominal damages award or any other judgment does not affect the prevailing party inquiry, it does bear on the propriety of fees awarded [in that it affects

the "degree of success" inquiry].'" (quoting <u>Farrar v. Hobby</u>, 506 U.S. 103, 114 (1992))).  The district court, however, did not expressly rely on this basis when setting the attorney fee.

Further, we note that a plaintiff's success in a civil rights case can be measured only in part by monetary success.  As such, dramatic reductions in fee awards are not always required simply because the actual damage award is small or nominal. Lawsuits like the present case provide a forum for exposing official misconduct. Hopefully, this exposure helps induce governmental entities to institute policies protective of civil rights.  <u>Emery</u>, 272 F.3d at 1046 ("Congress intended to 'promote diffuse private enforcement of civil rights law by allowing the citizenry to monitor rights violations at their source, while imposing the costs of rights violations on the violators.'" (quoting <u>Casey v. Cabool</u>, 12 F.3d 799, 805 (8th Cir. 1993))).  The risk of such lawsuits also provides an incentive to ensure adequate training and supervision of personnel.  Although these benefits enure to society in general, we believe a court assessing a particular plaintiff's relative degree of success may consider these non-monetary effects along with the personal monetary award a plaintiff receives.  <u>See</u> <u>Wal-Mart Stores, Inc. v. Barton</u>, 223 F.3d 770, 773 (8th Cir. 2000) ("[S]uccess may nonetheless be considered significant, in light of the fact that the . . . verdict . . . 'not only serve[d] to vindicate important personal rights as envisioned by the statute, but also [to] further the public's interest in providing a fair playing field . . . .'" (quoting <u>Shrader v. OMC Alum. Boat Group, Inc.</u>, 128 F.3d 1218, 1222 (8th Cir.1997))).

We make no further comment as to the propriety of the exact fee award the court reached herein.  On remand, the court should consider the relationship between the successful and unsuccessful claims and also the overall degree of success obtained by Lash Sr.  To the extent the submissions regarding attorneys' time entries are insufficiently specific to differentiate between claims, the consequences of such a shortcoming rests with the prevailing party.  <u>See</u> <u>Hensley</u>, 461 U.S. at 437 n.12 ("'[W]e would not view with sympathy any claim that a district court abused its

discretion in awarding unreasonably low attorney's fees . . . if counsel's records do not provide a proper basis for determining how much time was spent on particular claims.'" (quoting <u>Nadeau v. Helgemoe</u>, 581 F.2d 275, 279 (1st Cir. 1978))).

We affirm the denial of the motion for a new trial and remand for reconsideration of the fee award.

_____