In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2331

CHET CYRUS, et al.,

*Plaintiffs-Appellants*,

*v.*

TOWN OF MUKWONAGO, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:07-cv-01035—**Rudolph T. Randa**, *Judge*.

ARGUED OCTOBER 26, 2009—DECIDED NOVEMBER 10, 2010

Before BAUER and SYKES, *Circuit Judges*, and SIMON, *District Judge*.[*]

SYKES, *Circuit Judge*. Nickolos Cyrus suffered from bipolar disorder and schizophrenia and was known to local police based on past psychotic—but noncrimi-

---

[*] The Honorable Philip P. Simon, United States District Judge for the Northern District of Indiana, sitting by designation.

nal—episodes. Early one morning, after being reported missing by his family and while in a delusional state, he wandered into a partially built new home in Mukwonago, Wisconsin, wearing nothing but a bathrobe. The property owner was present and called the police. Town of Mukwonago Lieutenant Thomas Czarnecki was the first to respond to the scene, and by then Cyrus was standing outside the house. The officer approached and asked him to come to the squad car to talk. Instead, Cyrus turned and began walking back toward the house.

Czarnecki fired his Taser at Cyrus to stop him from reentering the house, and this set in motion a confluence of events. Cyrus fell to the ground after being hit with the Taser. He attempted to stand up but immediately fell over. Czarnecki Tasered Cyrus a second time. Cyrus went into a barrel roll and ended up lying face down on the unfinished gravel driveway. A second police officer arrived, and he and Czarnecki attempted to handcuff Cyrus, but this was difficult because Cyrus's hands were tucked underneath his stomach and he did not comply with the officers' commands to produce them for handcuffing. Czarnecki Tasered Cyrus several more times—there is a dispute about how many—in an effort to force compliance with the arrest. Once Cyrus was handcuffed, the officers turned him onto his back and found he was not breathing. He was pronounced dead upon arrival at the hospital.

Cyrus's parents sued Lieutenant Czarnecki, the Town of Mukwonago, and other defendants under 42 U.S.C.

§ 1983 alleging that Cyrus's death was caused by the use of excessive force in violation of the Fourth Amendment. The district court granted the defendants' motion for summary judgment, holding that the amount of force used to apprehend Cyrus was reasonable under the circumstances. Cyrus's parents appealed.

We reverse. There are material facts in dispute about the extent to which Cyrus attempted to evade the officers and the actual amount of force Czarnecki used to bring about his arrest. The evidence conflicts, most importantly, on how many times Cyrus was Tasered. Czarnecki testified that he deployed his Taser five or six times, and the autopsy report describes marks on Cyrus's back consistent with roughly six Taser shocks. But the Taser's internal computer registered twelve trigger pulls, suggesting that more than six shocks may have been used. On a Fourth Amendment excessive-force claim, these are key factual disputes not susceptible of resolution on summary judgment.

## I. Background

This case is before us on summary judgment, so we recount the version of the facts most favorable to the nonmoving parties—Cyrus's parents and his estate—noting disputes where they exist.

### A. The Events of July 8 and 9, 2006

Nickolos Cyrus suffered from bipolar disorder with symptoms of schizophrenia, and he sometimes exhibited

delusional behaviors that required police intervention. This was the case on July 8, 2006. Cyrus, who was then 29 years old and lived with his parents in Mukwonago, left his home on that day, and a Rock County Deputy Sheriff found him wandering along an interstate highway in a delusional state. He was taken to the Rock County Mental Health Facility for evaluation and then released to the custody of his mother, Brenda Cyrus. Cyrus and his mother had a dispute later that evening, and Cyrus removed all his clothes except a bathrobe (and possibly boxer shorts) before leaving home a second time. Brenda Cyrus contacted the Village of Mukwonago Police Department, told the dispatcher what happened, and said she wanted her son taken into custody when the police found him.

At about 7:45 a.m. the next day, emergency dispatchers received a call from Bradford Williams, a resident of the Town of Mukwonago, who said that an unknown man was trespassing on his property—a new home under construction in the Town—and the man was acting strangely. Williams reported that the trespasser wore only a bathrobe and that Williams had a verbal confrontation with him. Lieutenant Thomas Czarnecki, the Town's on-duty officer, was dispatched to the Williams property. The dispatcher informed Czarnecki that the property owner and the suspect had a verbal exchange inside the home, and that the suspect could be found walking back and forth between the home and a garbage dumpster outside. The dispatcher also told Czarnecki that the suspect was likely "that crazy boy." Czarnecki understood this to be a reference to Cyrus; he was familiar with Cyrus from

prior delusional episodes, and also knew he had been reported missing the night before.

Czarnecki arrived at the scene at approximately 7:50 a.m. and saw Williams standing in his driveway and Cyrus standing near the house wearing just a bathrobe. The officer got out of his squad car, assumed an "open stance" toward Cyrus, identified himself, and asked Cyrus to come toward the street to talk. Cyrus told Czarnecki that he lived on the property and that his brother lived next door. Czarnecki told Cyrus that he was on the wrong property. Cyrus responded by saying that Czarnecki was on private property and needed to leave.

After this brief dialogue, Cyrus turned and made his way back toward the house; Czarnecki contends that Cyrus ran, not walked, in the direction of the house. Czarnecki then unholstered his Taser and fired it at Cyrus, striking him in the back with both probes and causing him to fall to the ground.[1] Czarnecki knew that

---

[1] Czarnecki carried a TASER X26 ECD, a stun device that sends an electric pulse through the victim's body causing disorientation, weakness, and loss of balance. The device has two modes of firing. The first mode fires two probes that are connected to the Taser gun by a high-voltage, insulated wire. When the probes make contact with the body, an electrical current passes through the surface of the body. The Taser emits a current as long as the trigger is pulled or for a maximum duration of five seconds. The second method of deployment is the "drive-stun" mode. In this mode the operator presses the Taser to a subject's body and then pulls the trigger to emit

(continued...)

backup was en route to the scene; he ordered Cyrus—who was lying on his stomach on the unpaved gravel driveway as a result of being hit with the Taser—to remain on the ground and put his hands behind his back. After Czarnecki issued this order, Officer Eric Nelson of the Village of Mukwonago Police Department arrived.[2] Nelson got out of his squad car, and at this point Cyrus attempted to stand up but wobbled on his feet and fell back down to the ground. Though he knew Cyrus was unarmed, Czarnecki hit him with the Taser again; after this second shock, Cyrus barrel-rolled four or five times down the driveway.[3]

When Cyrus stopped rolling, Czarnecki and Nelson approached him and commanded that he show his hands for handcuffing. Cyrus was lying on his stomach on the

---

[1] (...continued)
a current. The deployment lasts as long as the trigger is pulled or for a maximum duration of five seconds. The device contains an internal computer chip that records the date and time of every trigger pull. *See generally Cyrus v. Town of Mukwonago*, No. 07-C-1035, 2009 WL 1110413, at *11 (E.D. Wis. Apr. 24, 2009).

[2] The Town of Mukwonago and the Village of Mukwonago are separate municipalities and have a practice of providing mutual emergency assistance.

[3] There is some conflict in the evidence about the precise chronology of these events. For instance, it is unclear whether Nelson arrived before or after Cyrus attempted to stand up, and whether Nelson arrived before or after the second Tasering. Moreover, the accounts differ as to whether Cyrus barrel-rolled before or after Czarnecki Tasered him for the second time.

driveway with his hands underneath him and did not immediately comply, so the officers attempted to forcibly remove his hands from underneath his body. More specifically, Czarnecki grabbed Cyrus's left forearm with one hand and kept his other hand on the Taser, while Nelson placed his left knee on Cyrus's right shoulder blade to control Cyrus's movement. This maneuver did not succeed in dislodging Cyrus's hands from underneath him; to force compliance, Czarnecki deployed the Taser in drive-stun mode to Cyrus's back several times over the next minute or so. The evidence conflicts about exactly how many times Czarnecki used the Taser on Cyrus while he was face down in the driveway. Czarnecki testified at his deposition that he fired it approximately six times *in total*—twice during the initial encounter and four more times while Cyrus was on the ground. The medical examiner who performed the autopsy documented marks on Cyrus's back consistent with six Taser shots. Yet the Taser's internal readout of trigger pulls recorded a total of 12 trigger pulls during the relevant timeframe.

The officers eventually succeeded in handcuffing Cyrus and called for an ambulance on a nonemergency basis. But when they rolled Cyrus onto his back, they realized that he was not breathing. Czarnecki then radioed the ambulance and instructed the paramedics to "step it up." Cyrus never regained consciousness and was formally pronounced dead at the hospital later that day.

**B.  District-Court Proceedings**

Chet and Brenda Cyrus, Nickolos's parents, commenced this action on behalf of themselves and Cyrus's estate (collectively "the Estate") against Lieutenant Czarnecki, Officer Nelson, the Village of Mukwonago, the Town of Mukwonago, and the police chief of each municipality. The complaint included multiple federal- and state-law claims, but the only one remaining on this appeal is a Fourth Amendment excessive-force claim under § 1983.[4]

The Estate identified two expert witnesses: Joseph Waller, who was to testify on the reasonableness of Czarnecki's use of force during Cyrus's arrest, specifically relating to his use of the Taser; and Dr. Lynda Biedrzycki, the Waukesha County Medical Examiner, who performed the autopsy on Cyrus's body and would testify about

---

[4]  In addition to the Fourth Amendment excessive-force claim against Czarnecki, the complaint also included a failure-to-intervene claim against Officer Nelson under § 1983; policy-or-practice claims against the Town and Village of Mukwonago under *Monell v. Department of Social Services,* 436 U.S. 658 (1978); supervisory-liability claims against the police chiefs in both the Town and Village of Mukwonago under § 1983; claims under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131 *et seq.*, and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and state-law claims for assault and battery, intentional infliction of emotional distress, and wrongful death. The district court granted summary judgment for the defendants on all claims, but the Estate has limited its arguments on appeal to the Fourth Amendment excessive-force claim.

the results of her examination and the cause of Cyrus's death. Dr. Biedrzycki had certified the cause of death as "sudden death during struggle and restraint," and identified eight factors that she believed contributed to Cyrus's death: (1) the exertion and struggle with the officers; (2) panic and fear; (3) Cyrus's prone position; (4) the pressure applied to Cyrus's torso and possibly neck; (5) Cyrus's psychiatric condition; (6) Cyrus's restraint in handcuffs and the officers' additional attempts to restraint him with leg irons; (7) the pain and panic caused by the Taser; and (8) the electrical shock from the Taser. Dr. Biedrzycki testified at her deposition that while she believed all eight factors contributed to Cyrus's death, she could not determine whether any one factor was more significant than the others.

Following discovery the defendants moved to exclude the testimony of both experts pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The district judge excluded the majority of Waller's testimony and Dr. Biedrzycki's testimony about the cause of death. The judge concluded that because Dr. Biedrzycki could not "unbundle" the factors contributing to Cyrus's death—that is, she could not isolate one factor as the primary cause of death—her opinion testimony on cause of death was inadmissible. The Estate does not challenge either of these evidentiary rulings on appeal.

After excluding this testimony, the district judge entered summary judgment for the defendants on all claims. As is relevant to the sole claim on appeal—the

Fourth Amendment claim for excessive use of force—the judge held that the material facts were undisputed, and in light of all the circumstances, Czarnecki's deployment of the Taser did not constitute excessive force as a matter of law. This conclusion was based largely on Czarnecki's deposition testimony. The lieutenant testified that he decided to use his Taser for several reasons: (1) he knew there had been a verbal confrontation between Williams and Cyrus; (2) he suspected Cyrus might have placed a weapon in the dumpster; and (3) he wanted to take Cyrus into custody while he was still outside the house for safety reasons. The district judge accepted this explanation and noted in addition that the force inflicted by a Taser is classified as "intermediate" in that it is generally nonlethal. Finally, the judge relied on the fact that Cyrus had not obeyed the officers' commands and refused to show his hands for handcuffing. The court concluded that under these circumstances, Czarnecki's use of the Taser was objectively reasonable.

## II. Discussion

We review the district court's decision to grant summary judgment de novo. *Suarez v. Town of Ogden Dunes*, 581 F.3d 591, 595 (7th Cir. 2009). Summary judgment is appropriate when the record evidence shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Excessive-force claims in the context of an arrest are reviewed under the Fourth Amendment's objective-reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005). This inquiry requires an examination of the "totality of the circumstances to determine whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing government[al] interests at stake." *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000). The nature and extent of the force that may reasonably be used to effectuate an arrest depends on the specific circumstances of the arrest, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. If the suspect is mentally ill, the officer's awareness of his mental illness is also a factor in the analysis. *Abdullahi*, 423 F.3d at 772. Because law-enforcement officers must make critical, split-second decisions in difficult and potentially explosive situations, *Graham*, 490 U.S. at 397, we evaluate the reasonableness of the officer's actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *id.* at 396.

The district court's summary-judgment decision was premised on its view that the material facts were undisputed, making "the reasonableness of the [officer's use of] force . . . a legal issue." The court relied on *Bell v. Irwin*, 321 F.3d 637 (7th Cir. 2003), for this proposition, and indeed, *Bell* held that "when material facts (or enough

of them to justify the conduct objectively) are undisputed, then there would be nothing for a jury to do *except* second-guess the officers." *Id.* at 640. In this situation, we said in *Bell,* the reasonableness of the force used is a legal question. *Id.* But we also said that "[w]hen material facts are in dispute, then the case must go to a jury, whether the argument is that the police acted unreasonably because they lacked probable cause, or that they acted unreasonably because they responded overzealously and with too little concern for safety." *Id.* And we have recognized that summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations. *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009). This principle is particularly relevant where, as here, the one against whom force was used has died, because the witness most likely to contradict the officer's testimony—the victim—cannot testify. *Gregory v. County of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008).

Here, there is conflicting evidence about just how much force Lieutenant Czarnecki used against Cyrus. Czarnecki testified that he deployed the Taser five or six times, and Dr. Biedrzycki noted that the marks on Cyrus's back were consistent with five or six Taser shocks.[5] The Taser's internal computer, however, registered 12 trigger pulls during the relevant time period.

---

[5] The district court did not exclude this portion of Dr. Biedrzycki's testimony.

Although a jury might conclude that the additional six trigger pulls were not in fact "deployments" that emitted an electrical charge into Cyrus's body,[6] the Taser's internal computer record creates enough of a factual discrepancy on the degree of force used to preclude summary judgment. This dispute is obviously material because the amount of force used bears directly on whether that force was a reasonable response to the situation faced by the officer.

The evidence is also conflicting on the extent to which Cyrus resisted arrest. *See Graham*, 490 U.S. at 396 (considering whether the defendant evaded arrest by flight). To be sure, there is evidence that Cyrus did not obey Czarnecki's commands. But his behavior is susceptible of different interpretations. The parties dispute whether Cyrus ran or merely walked toward the house after Czarnecki told him he was on the wrong property. And although Czarnecki characterizes Cyrus's barrel-roll down the driveway as an attempt to flee, a jury might see it differently. That is, the jury might reasonably conclude that the barrel-roll was an involuntary reaction to the second Taser shock.

---

[6] The Taser will emit only one discharge every five seconds, even if the operator pulls the trigger more than once in a five-second period. But the internal computer registers each trigger pull regardless of whether that pull emits a shock. For example, if Czarnecki pulled the trigger two times consecutively, the Taser would emit only one shock but the computer would register two trigger pulls.

Summary judgment was also inappropriate because a jury could conclude that Czarnecki's use of force was excessive in light of the other *Graham* factors. Cyrus had, at most, committed a misdemeanor offense under Wisconsin law,[7] and he was not exhibiting violent behavior, *see Casey v. City of Federal Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007) (noting that a lesser degree of force is reasonable when the offense of arrest is not committed violently). As importantly, there is no evidence suggesting that Cyrus violently resisted the officers' attempts to handcuff him. Although he refused to release his arms for handcuffing (or perhaps he could not because of the influence of the Taser shock), Czarnecki knew that Cyrus was unarmed and there was little risk Cyrus could access a weapon while face down at the foot of the driveway, with his hands underneath him and having already been shocked twice with the Taser. Moreover, Czarnecki was familiar with Cyrus and was aware of his mental illness; he testified at his deposition that Cyrus had never acted violently toward him.

---

[7] Possibilities include criminal trespass to dwelling in violation of WIS. STAT. § 943.14, or entry onto a construction site or into a locked building, dwelling, or room in violation of WIS. STAT. § 943.15(1). When Cyrus turned and moved away from Czarnecki, he may have also violated WIS. STAT. § 946.41(1), which makes it illegal to knowingly resist or obstruct an officer acting in an official capacity. All three possible violations are class A misdemeanors punishable by a maximum fine of $10,000, a maximum prison term of nine months, or both. WIS. STAT. § 939.51(3)(a).

Defense counsel suggested at oral argument that if Lieutenant Czarnecki's first use of the Taser was reasonable, all other uses were necessarily appropriate because once an officer is justified in using a particular level of force to effectuate an arrest, he can continue to use that same level of force until the suspect is apprehended. Not so. Force is reasonable only when exercised in proportion to the threat posed, *see Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009) ("Quite simply, though the initial use of force (a single Taser shock) may have been justified, the repeated tasering . . . was grossly disproportionate to any threat posed and unreasonable under the circumstances."), and as the threat changes, so too should the degree of force, *see Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). Force also becomes increasingly severe the more often it is used; striking a resisting suspect once is not the same as striking him ten times. It's the totality of the circumstances, not the first forcible act, that determines objective reasonableness.

Accordingly, a jury might reasonably conclude that the circumstances of the encounter here reduced the need for force as the situation progressed. When Czarnecki first arrived at the scene, he was the only officer on site, and his concern that Cyrus might retrieve a weapon or pose a threat to persons inside the house was clearly reasonable. On the other hand, once Cyrus was on the ground, unarmed, and apparently unable to stand up on his own, the risk calculus changed. Or so a jury might reasonably conclude. Summary judgment was therefore inappropriate.

Czarnecki argues as a fallback position that because the Estate has not challenged the district court's exclusion of much of Dr. Biedrzycki's testimony, there is insufficient evidence to create a jury question about causation. *See Berman v. Young*, 291 F.3d 976, 982 (7th Cir. 2002). We disagree, although it is certainly true that the district court's exclusion of key medical-examiner testimony—an issue unaddressed and therefore abandoned on appeal—makes the task of proving causation much more difficult.[8]

Czarnecki maintains that asking a jury to infer causation without expert testimony would be akin to proceeding under a theory of *res ipsa loquitur*—improper in a § 1983 action—because the Estate would have to argue that the

---

[8] We note again that the district judge excluded Dr. Biedrzycki's testimony on cause of death because she could not "unbundle" several contributing causes, which included Czarnecki's use of the Taser. But we have held that an expert's inability to isolate one specific factor when multiple factors cause an injury implicates the weight of the expert's testimony, not its admissibility. *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000) ("The fact that several possible causes might remain 'uneliminated' . . . only goes to the accuracy of the conclusion, not to the soundness of the methodology." (quotation marks omitted)). Because evidentiary weight is a jury question, expert testimony on the cause of an injury is admissible even when it does not eliminate all other possible causes of injury. *Id.* ("In order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury."); *see also St. Paul Mercury Ins. Co. v. Viking Corp.*, 539 F.3d 623, 628-29 (7th Cir. 2008).

force Czarnecki used must have been excessive because people do not ordinarily die after being shocked with a Taser. He relies on *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 594-95 (7th Cir. 1997), and *Brownell v. Figel*, 950 F.2d 1285, 1292-93 (7th Cir. 1991), as support for this argument, but this reliance is misplaced. We held in *Phillips* and *Brownell* that a plaintiff cannot ask a jury to infer that an officer used excessive force based solely on the fact that an injury occurred. The plaintiff must instead identify the specific conduct of the officer that is alleged to be excessive and unreasonable; the fact of an injury while in police custody is not enough. We elaborated on this principle in *Abdullahi*, explaining that *Phillips* and *Brownell* "stand for the proposition that . . . a plaintiff must identify the specific unreasonable conduct that caused his or her injuries." 423 F.3d at 770-71. Thus, a plaintiff claiming that an officer used excessive force cannot merely assert "that the facts support an inference of 'excessive force, the precise nature of which has yet fully to come to light.'" *Id.* at 770 (quoting *Brownell*, 950 F.2d at 1292).

The rule of *Phillips* and *Brownell* thus focuses on the type of proof required to establish the first element of an excessive-force claim—that is, that the officer in question used objectively unreasonable force under the circumstances. Here, the Estate has amply identified the specific conduct it contends was excessive and unreasonable under the circumstances. *Phillips* and *Brownell* are inapplicable.

Still, as we have noted, without expert testimony, causation will be difficult to establish. But the record

contains enough evidence from which a reasonable jury could conclude as a matter of lay judgment that the excessive use of force—if indeed Czarnecki's use of force was excessive and unreasonable—caused Cyrus's death. Common-law rules of tort causation apply to § 1983 claims, *see Herzog v. Vill. of Winnetka*, 309 F.3d 1041, 1044 (7th Cir. 2002), and the general rule is that expert testimony is not necessary to prove causation "if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience or observation." *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962) (quotation marks omitted); *see also Abdullahi*, 423 F.3d at 771 (examining whether the injury was consistent with excessive force).

The "primary facts" here include the close temporal proximity between the allegedly excessive force and Cyrus's death: Cyrus stopped breathing just a minute or two after being repeatedly shocked with the Taser, and this tight chronology bears on causation. Other evidence suggests that potential alternative causes of death may be ruled out. For example, the toxicology report, which the district court did not exclude, shows that Cyrus ingested no stimulants or narcotics other than a minimal amount of caffeine. There is no evidence that Cyrus had any prior injuries that could have caused his death during the confrontation with the officers, *see Brownell*, 950 F.2d at 1293 (refusing to find liability because plaintiff was also involved in a serious car

accident that could have caused his injury), or that he suffered from a preexisting condition that could have caused his cardiac arrest, *Lash v. Hollis*, 525 F.3d 636, 640 (8th Cir. 2008) (refusing to infer causation based on lay evidence because, *inter alia*, the victim possibly suffered from a preexisting medical condition). There is no evidence of any possible intervening causes of death.[9] In short, although the exclusion of a significant part of the medical examiner's testimony leaves the Estate with a major gap in its case, the record is not so wholly devoid of evidence on which a jury could find causation that Czarnecki is entitled to judgment as a matter of law on this alternative basis.

REVERSED and REMANDED

---

[9] Though excluded, Dr. Biedrzycki's testimony on causation does suggest, however, that an individual with bipolar disorder or schizophrenia could be more likely than an average person to suffer cardiac arrest in this situation.