# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-2580
No. 14-2648

_____

Edward P. Hagen, DO

*Plaintiff - Appellee/Cross-Appellant*

v.

Siouxland Obstetrics and Gynecology, PC, et al.

*Defendants - Appellants/Cross-Appellees*

_____

Appeals from United States District Court
for the Northern District of Iowa - Sioux City

_____

Submitted: April 13, 2015
Filed: August 20, 2015

_____

Before RILEY, Chief Judge, LOKEN and SHEPHERD, Circuit Judges.

_____

LOKEN, Circuit Judge.

Siouxland Obstetrics & Gynecology, P.C. ("Siouxland"), of Sioux City, Iowa, terminated Edward Hagen, its President and an equity owner, invoking the for-cause termination provision in Hagen's January 1, 1993, Employment Agreement. Hagen filed this diversity action against Siouxland and three co-owners and partners in its Ob/Gyn practice, Drs. Paul J. Eastman, Tauhni T. Hunt, and Angela J. Aldrich

(collectively, "Siouxland"). Hagen's complaint alleged, *inter alia*, breach of contract and wrongful retaliatory discharge in violation of Iowa public policy. After an eight-day trial, a jury upheld the public policy tort claim, awarding Hagen $1,051,814 in compensatory damages. The district court denied Siouxland's motion for judgment as a matter of law or a new trial and Hagen's motion for additur. Siouxland appealed; Hagen cross-appealed. Reviewing issues of Iowa law *de novo*, we conclude that Hagen failed to prove he was an at-will employee who may assert a tort claim for wrongful discharge in violation of Iowa public policy and therefore reverse.

## I. Background Facts

We view the facts relevant to the controlling issue of law in the light most favorable to the jury's verdict. At the time in question, Siouxland was a professional corporation conducting the group practice of four obstetrician/gynecologists and was one of two "women's clinics" in Sioux City. It was located across the street from St. Luke's Hospital. Siouxland was established in the early 1960s by Hagen's father, also an Ob/Gyn doctor. Hagen received an Iowa license to practice medicine and joined his father's practice in 1992.

Hagen's Employment Agreement was executed by his father on behalf of Siouxland as Employer. The Agreement guaranteed Hagen an initial monthly salary, subject to adjustment; a discretionary bonus "to make the total compensation . . . equal to the reasonable value of his services"; deferred compensation in the event of death or disability and continuation of his salary during the first six months of disability; office space and staff "adequate for the performance of his duties"; and four weeks of paid vacation per year. Hagen agreed "to devote substantially all of his time and attention" to Siouxland's practice of medicine and not to engage in the practice of medicine other than as Siouxland's employee. Article I provided that the Agreement was for automatically renewable one-year terms "subject, however, to prior termination." Article XI, the lengthy Termination section, provided that the

-2-

Agreement would terminate upon Hagen's death, permanent disability, or loss of license to practice medicine in Iowa; by mutual agreement of the parties; at the option of either party upon ninety-days written notice of cancellation; or by Siouxland -

> in the event of embezzlement or other theft; willful contravention of professional ethics; substantial and willful violation of any other terms or conditions of this Employment Agreement, all subject to determination by the Board of Directors of the CORPORATION.

Hagen helped his father recruit defendants Hunt, Aldrich, and Eastman to the Siouxland practice group later in the 1990s. When Hagen's father retired in the early 2000s, Hagen became President of Siouxland. The four physicians were on-call for the group the same number of nights, weekends, and holidays. All four had privileges at St. Luke's hospital. Hagen testified that Hunt and Aldrich, both females, attracted more patients than Eastman and Hagen, causing "some friction in the office."

Turning to the events at issue, Dr. Hagen testified that, shortly before his on-call shift began at 5:00 on November 5, 2009, Dr. Eastman called to advise that his patient, Maria Maeda, was thirty-four weeks pregnant, previously had a liver transplant, and now had sepsis, an infection that can endanger an unborn baby. Maeda was admitted to St. Luke's early that afternoon with premature contractions. Eastman had not seen her. He thought Maeda's medical doctors were transferring her to a hospital in Omaha, but had learned she was still at St. Luke's because the Omaha hospital considered her too sick to travel. Hagen then called or was paged by St. Luke's and was told by the labor and delivery unit that the baby's heart rate was 130 and they were trying to transfer Maeda to intensive care.

When Dr. Hagen arrived at the hospital, he was told by the ultrasound technician and confirmed that the baby was no longer alive. Hagen asked one of the delivery room nurses how long the baby had been dead. She did not know. Hagen

testified he then said to two nurses, "How the fuck can this happen at St. Luke's that they watch a baby die on the monitor, suffocate, and do nothing?" He then told the nurses, "You killed this baby. You watched this baby die on the monitor. I mean, you guys did nothing." Hagen then called Eastman and told him, "You didn't come see her, and this baby is dead, and now I've gotta do a C-section on a mother and deliver a dead body." Hagen then informed Maria's husband of the baby's death.

The next day, Hagen told the head of St. Luke's medical staff and its chief financial officer that he was "reporting" himself for yelling and swearing at the nurses, the nurses for "not treat[ing] this patient well," and Eastman for not coming to see Maeda. Hagen returned to the Siouxland office where he consulted several attorneys about the incident. One said Hagen may have a duty to report what he believed was Eastman's malpractice to the Iowa state medical board. Hagen informed Eastman he had been advised to report him to the medical board and told his other partners he was inclined to report Eastman.

On Monday, November 9, the head of St. Luke's medical staff called and informed Hagen he was being suspended for ten days for yelling at the nurses and cursing in the intensive care unit. He received the suspension notice on Tuesday and told his partners, "I'm going to tell the patient, you know, to sue this hospital . . . . You know, we're going to take St. Luke's down. I can't take St. Luke's down. There's nothing for me to sue the hospital for. But the patient can, so I'm going to tell the patient to call a lawyer and investigate this." On Wednesday night, Hagen called Maeda at the hospital and told her: "Maria, you were mistreated. This is malpractice. The nurses missed the boat. Dr. Eastman missed the boat, and I think you should get an attorney." On Thursday, November 12, Hagen told his Siouxland partners about the phone call and left for a long weekend at his cabin in Wisconsin.

After Hagen left, Aldrich told her partners she was leaving Siouxland because of Hagen's behavior. Hunt and Eastman said they would leave, too. After consulting

Siouxland's attorney, the three physicians agreed to terminate Hagen for cause instead of leaving the group. Hagen attended a meeting of the Siouxland principals on Monday, November 16, and was fired "for willful contravention of professional ethics and substantial and willful violation of other terms or conditions of his employment agreement."

At trial, Hunt testified to a history of workplace conflict involving Hagen that increased as Hagen gained seniority:

> [I]t turned into more of a bully type of atmosphere. [Hagen] became a little more dominant, and it was -- it seemed a little bit more abusive at times too because really you just wanted to avoid him. He made the rules. He would change the rules. You didn't know when the rules changed. And you really just wanted to stay away from him.

Eastman described Hagen's outbursts at hospitals, including throwing a vacuum against a wall during a C-section, leading to blood splattering over the wall, and breaking instruments during surgery. Aldrich explained she voted to terminate Hagen because "I could not work with him anymore with the way that he is, him yelling, disruptive, patients telling me they don't like him, please stick around, Dr. Aldrich, for the weekend. I don't want Dr. Hagen to deliver me . . . . I just could not work with him anymore." Aldrich also worried that Hagen's suspension would hurt Siouxland's reputation. On cross-examination, Hagen admitted he yelled at nurses, once broke hospital equipment, and had used the nickname "All Bitch" to describe Aldrich. Hunt testified that Hagen was fired because the other doctors did not "feel comfortable having one partner that's so abusive and so erratic."

Siouxland's attorney testified that, in his opinion, Hagen's conduct provided four reasons justifying immediate termination: (1) harming the practice's relationship with St. Luke's hospital by threatening to sue it; (2) conducting another medical practice without the consent of the other Siouxland directors, contrary to the terms

of employment; (3) disruptive behavior; (4) inability to cover calls at the hospital due to the suspension. He also believed that Hagen's disruptive behavior causing his suspension at St. Luke's could constitute breach of an ethical duty.

## II. Procedural History

Hagen's twelve-count Complaint included claims for breach of contract and retaliatory discharge in violation of public policy. After the district court denied Siouxland summary judgment on the contract claim, Hagen's Trial Brief advised the court that breach of contract was one of nine claims that "are not being pursued by Plaintiff." Only the public policy tort claim is at issue on appeal.

Over Siouxland's objections, the district court instructed the jury that the following conduct, "if engaged in by Dr. Hagen, is protected by Iowa public policy:"

> Dr. Hagen reporting, stating an intention to report, or stating that he might report to a hospital conduct of nurses that Dr. Hagen believed may have involved wrongful acts or omissions
>
> Dr. Hagen disclosing to a patient or a patient's family that the patient may have been the victim of negligent care or malpractice
>
> Dr. Hagen consulting with an attorney, stating an intention to consult with an attorney, or stating that he might consult with an attorney about whether Dr. Eastman or nurses had committed wrongful acts or omissions that Dr. Hagen should report to the Iowa Board of Medicine or a hospital.

The jury found that Defendants had wrongfully discharged Hagen in violation of public policy because those three protected activities were a "determining factor" in Siouxland's decision to terminate.

Defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) and for a new trial pursuant to Rule 59. Siouxland argued, *inter alia*, that Hagen's conduct was not protected by Iowa public policy and, alternatively, that Hagen failed to prove he was an at-will employee, an essential element of the wrongful discharge tort claim under Iowa law. Hagen argued Siouxland had not preserved the latter theory before the case was submitted to the jury. Before ruling on Siouxland's motion, the district court certified three questions to the Supreme Court of Iowa: (1) "Does Iowa law recognize [the conduct found by the jury] as protected conduct on which a doctor-employee can base a claim for wrongful discharge in violation of Iowa public policy"; (2) "Does Iowa law allow a contractual employee to bring a claim for wrongful discharge in violation of Iowa public policy, or is the tort available only to at-will employees"; (3) "Under Iowa law, is an employer's lack of an 'overriding business justification' for firing an employee an independent element of a wrongful discharge claim, or is that element implicit in the element requiring that an employee's protected activity be the determining factor in the employer's decision to fire the employee?" The Order Certifying Questions included a lengthy analysis explaining why the district court concluded that the tort claim applies to contractual employees and that the activities in question were protected conduct. Hagen v. Siouxland Obstetrics & Gynecology, P.C., 964 F. Supp. 2d 951 (N.D. Iowa 2013).

In an unpublished opinion, the Supreme Court of Iowa declined to answer the certified questions. "[T]he justices are equally divided on the first certified question," the Court explained. "Because a negative answer to the first question would be dispositive of the case, we will not answer the second or third certified question when the court is equally divided on the answer to the first certified question." Hagen v. Siouxland Obstetrics & Gynecology, P.C., No. 13-1372 (Iowa May 9, 2014). The district court then denied Siouxland's post-verdict motions. Hagen v. Siouxland Obstetrics & Gynecology, P.C., 23 F. Supp. 3d 991 (N.D. Iowa 2014).

Hagen filed a post-trial motion seeking pre- and post-judgment interest plus an additur for $112,727 in past lost earnings and $4,406,870 in future lost earnings. The district court granted Hagen pre- and post-judgment interest but denied his motion for additur. Siouxland appealed, arguing five issues, only one of which we need discuss. Hagen cross-appealed the denial of his motion for additur. The cross appeal is mooted by our determination that the district court should have entered judgment as a matter of law in favor of Siouxland.

### III. Discussion

**A.** Siouxland argues that the contractual protections provided in Hagen's Employment Agreement preclude him from asserting a tort claim for wrongful discharge in violation of Iowa public policy. Although Siouxland made Rule 50(a) motions for judgment as a matter of law at the close of plaintiff's case, and again at the close of all the evidence, alleging insufficient evidence to establish a claim of wrongful discharge in violation of public policy, Siouxland concedes that it first explicitly raised the contractual employee legal theory in defendants' post-trial Rule 50(b) motion. Hagen argues that Siouxland "cannot establish that reversal is warranted under the narrow 'plain error' standard."

We agree the general rule is that, "if the movant's legal theories are not articulated before the verdict, review is limited to whether the judgment sought is 'required to prevent manifest injustice,'" the plain error standard of review. Alternate Fuels, Inc. v. Cabanas, 538 F.3d 969, 973 (8th Cir. 2008) (citation omitted); see United States v. 353 Cases Mountain Valley Mineral Water, 247 F.2d 473, 477 (8th Cir. 1957). But a pre-verdict Rule 50(a) motion does not require "technical precision," and therefore grounds that are "inextricably intertwined" to those in the Rule 50(a) motion may be raised in a post-trial Rule 50(b) motion. Rockport Pharmacy, Inc. v. Dig. Simplistics, Inc., 53 F.3d 195, 197-98 (8th Cir. 1995). As the Supreme Court recently explained, a Rule 50(b) movant must have "sought relief on

similar grounds under Rule 50(a)." Whether to consider on appeal a matter not properly preserved in the district court is "left primarily to the discretion of the courts of appeals." Exxon Shipping Co. v. Baker, 554 U.S. 471, 485 n.5 & 487 (2008).

In this diversity case, though Hagen argued that Siouxland failed to preserve this issue, the district court nonetheless included it in the issues of law the court certified to the Supreme Court of Iowa for *de novo* review on the merits. By inviting *de novo* review by the Supreme Court of Iowa, the district court obviously concluded that the certified issues were sufficiently intertwined or similar to the issues preserved by Siouxland's Rule 50(a) motions and therefore would have followed that Court's controlling interpretation of Iowa law. In these circumstances, we, too, will exercise our discretion and review this issue *de novo*. And in any event, we would reach the same conclusion applying plain error review.

**B.** Turning to the merits, most States recognize a claim for wrongful discharge of an at-will employee in violation of public policy. The Supreme Court of Iowa initially recognized this tort as a "narrow exception[] to the employment at-will doctrine" and has consistently described the tort in those terms. Fogel v. Trs. of Iowa Coll., 446 N.W.2d 451, 455 (Iowa 1989); see Ballalatak v. All Iowa Agric. Ass'n, 781 N.W.2d 272, 275 (Iowa 2010); Jasper v. H. Nizam, Inc., 764 N.W.2d 751, 762-63 (Iowa 2009); Harvey v. Care Initiatives, Inc., 634 N.W.2d 681, 683 (Iowa 2001); Fitzgerald v. Salsbury Chem., Inc., 613 N.W.2d 275, 280-81 (Iowa 2000). Adhering to that Court's controlling precedents, we described the elements of this tort in Mahony v. Universal Pediatric Services, Inc., 643 F.3d 1103, 1106 (8th Cir. 2011):

> Iowa law provides that an at-will employee may be discharged at any time, without cause, but a well-recognized exception to the at-will doctrine is the tort action for wrongful discharge in violation of public policy. Fitzgerald v. Salsbury Chem., Inc., 613 N.W.2d 275, 280-81 (Iowa 2000). The elements of this cause of action are (1) existence of a clearly defined public policy that protects an activity; (2) discharge

from employment would undermine the policy; (3) the plaintiff was discharged as the result of participating in the protected activity; and (4) lack of other justification for the termination. Lloyd v. Drake Univ., 686 N.W. 2d 225, 228 (Iowa 2004). . . . Iowa courts "proceed cautiously, and will only extend such recognition to those policies that are well recognized and clearly defined." Lloyd, 686 N.W.2d at 229 (quotation omitted).

Courts in other States are divided over whether to limit the tort to at-will employees. Compare, e.g., Willitts v. Roman Catholic Archbishop of Boston, 581 N.E.2d 475, 479 (Mass. 1991), with Keveney v. Mo. Military Acad., 304 S.W. 3d 98, 102-03 (Mo. 2010). The Supreme Court of Iowa has not explicitly addressed the issue. In concluding that the Iowa Court would not "foreclose a wrongful discharge suit to a contractual employee" (contrary to prior decisions by two other Iowa district court judges), the district court did not cite our decision in Mahony, much less acknowledge its precedential effect. This was error. "In the absence of an intervening decision of the Iowa Supreme Court on the issue, the Eighth Circuit . . . decision in [Mahony] is controlling precedent." Stults v. Symrise, Inc., 989 F. Supp. 2d 735, 762 n.10 (N.D. Iowa 2013) (citations omitted).

Our research has uncovered three decisions of the Supreme Court of Iowa addressing the public policy wrongful discharge tort since our decision in Mahony. In Berry v. Liberty Holdings, Inc., 803 N.W.2d 106, 109, 112 (Iowa 2011), the Court again emphasized that it has "adopted a narrow public-policy exception to the general rule of at-will employment" and concluded that Iowa's comparative negligence statute "does not articulate a clearly defined and well-recognized public policy protecting the filing of a personal injury lawsuit." In Dorshkind v. Oak Park Place of Dubuque II, LLC, 835 N.W.2d 293, 300 (Iowa 2013), the Court again described the tort as "a public-policy exception to the general rule of at-will employment." In the very recent case of Rivera v. Woodward Resource Center, 2015 WL 3958720 (Iowa June 30, 2015), the Court answered the third question certified by the district

-10-

court in this case. The Court again noted that, in prior cases, "we have found multiple public policy rationales may support a wrongful termination claim of at-will employees in a variety of settings." Id. at *5. Thoroughly addressing the question of causation, the Court held that an employer's lack of an "overriding business justification" is not an independent *element* of the claim; rather, "legitimate business reasons supporting [the employer's action may] defeat the conclusion that the protected conduct was the determining factor in the adverse employment decision." Id. at *11. The Court concluded that the jury was wrongly instructed in Rivera but affirmed a jury verdict for the employer based on harmless error analysis.

None of these recent cases undermines our conclusion in Mahony that the wrongful discharge/public policy tort under Iowa law is a narrow, well-recognized exception to the at-will doctrine. As the Supreme Court of Iowa explained in Dorshkind, 835 N.W.2d at 303, "the exception is narrowly circumscribed to only those policies clearly defined and well-recognized *to protect those with a compelling need for protection from wrongful discharge*." (Emphasis added.) This focus on the at-will employee's need for protection, and the Court's refusal to address this certified question in the abstract in this case, strongly suggest that the district court erred in defining the question as being whether the tort protects "contractual employees" in general. There are many types of employment contracts that address the question of termination in a variety of ways. For example, in Stiles v. American General Life Insurance Co., 516 S.E.2d 449, 451 (S.C. 1999), the court extended the public policy exception for at-will employees to an employee whose written employment agreement allowed either party to terminate without cause on thirty days written notice because "the employee does not have an alternate [contract] remedy based on an allegation of wrongful discharge." We think it likely that, presented with an employment contract having the same without-cause provision, the Supreme Court of Iowa would agree.

The issue is far different where, as here, "an employee is protected from wrongful discharge by an employment contract." Silva v. Albuquerque Assembly &

Distrib. Freeport Warehouse Corp., 738 P.2d 513, 515 (N.M. 1987). Employer Siouxland invoked the for-cause termination provision in a comprehensive Employment Agreement negotiated by Hagen when he joined his father's medical practice years before he helped recruit the defendant physicians, Eastman, Hunt, and Aldrich. The contract provided Hagen a wrongful discharge remedy. At the time of termination, Hagen was President and co-owner of a professional corporation in which the physicians functioned as partners in a group practice, but enjoyed the advantage of limited liability afforded business corporation shareholders. See Iowa Code § 496C.9. He was an employee of a professional corporation that could only practice medicine through employees "who are licensed to practice the same profession in  this state." § 496C.7. He was not an employee "with a compelling need for protection from wrongful discharge."

This analysis is entirely consistent with the Supreme Court of Iowa's analysis in Harvey v. Care Initiatives, Inc., where the Court refused to apply the wrongful discharge tort to an independent contractor allegedly terminated for reporting employer conduct that she believed violated the rights of nursing home residents. 634 N.W.2d at 682-83. The Court noted that the wrongful discharge tort was "derived from the inequity of the bargaining position in a typical at-will employer-employee relationship, and the inability of employees to otherwise obtain protection." 634 N.W.2d at 684. Independent contractors do not require the same type of protection as at-will employees, the Court concluded:

> [A]n independent contractor can not only negotiate the circumstances governing termination of a contract, but has contract remedies to enforce all expressed or implied terms of a contract. This diminishes the need for court-based remedies. Moreover, judicial extension of tort remedies into contracts without clear legislative authority can essentially nullify terms agreed to by the parties to the contract. We find no compelling need, as we did for at-will employees, to support a wrongful termination tort for independent contractors.

-12-

Id.  The same is true of physicians who agree to share a group practice.  Moreover, applying this judicially-created remedy to groups of practicing medical professionals would raise public policy questions quite unlike those raised by the typical at-will employment relationships, well-illustrated by the professional dispute in this case.

The Supreme Court of Iowa ended its analysis in Harvey by noting that an independent contractor's contract remedies would not be exclusive if a statute clearly prohibited discharging a person in that position who engaged in well-defined protected conduct.  634 N.W.2d at 685.  Applying that inquiry to this case, we note that the Iowa Code and the Iowa Administrative Code bar an employer from discriminating against a person who files a complaint with a medical licensing board,[1] but not a complaint to a hospital, a patient, or an attorney.  See Iowa Code § 272C.8(1)(c); Iowa Admin. Code §§ 653-22.2, 653.24.1(3).

The Supreme Court of Iowa has consistently and carefully applied its wrongful discharge tort precedents to the specific facts of each case.  Here, we conclude that the Court would hold that the exclusive remedy of a medical professional practicing under Hagen's Employment Agreement is a breach of contract claim for wrongful discharge, a claim that would permit inquiry into the professional conduct the district court concluded was separately protected by the tort of wrongful termination in violation of public policy.  As Hagen pleaded a breach of contract claim but declined to pursue that claim at trial, the judgment of the district court is reversed and the case is remanded with directions to enter judgment as a matter of law for defendants.

––––––––––––––––––––––––––––

[1]The jury found that two types of protected conduct as defined by the district court were *not* determining factors in Hagen's discharge.  One was: "Dr. Hagen reporting, stating an intention to report, or stating that he might report to the Iowa Board of Medicine conduct of Dr. Eastman that Dr. Hagen believed may have involved acts, omissions, negligence, or malpractice."

-13-