# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-4399

_____

Calvin Fletcher, Sr.

*Plaintiff - Appellee*

v.

Joseph Tomlinson

*Defendant*

Nicholas Martorano; John Moton

*Defendants - Appellants*

Jonathan Carroll; City of St. Louis; St. Louis City Metropolitan Police
Department; Board of Police Commissioners; Corizon, Inc.; Dr. Jane Doe; Jane
Doe, 1; Jane Doe, 2; Richard Gray, in his capacity as police commissioner;
Thomas Irwin, in his capacity as police commissioner; Erwin Switzer, in his
capacity as police commissioner; Bettye Battle-Turner, in her capacity as police
commissioner; Francis G. Slay, in his capacity as police commissioner; Paul
Geiger; April Scott; Rhalashondra Straughter; Joyce Sanchez; Blake Leadbetter;
Jane Doe, 3; Jane Doe, 4; John Doe, 1; John Doe, 2

*Defendant*s

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: December 12, 2017
Filed: July 13, 2018

_____

Before SMITH, Chief Judge, ARNOLD and KELLY, Circuit Judges.

_____

SMITH, Chief Judge.

St. Louis Police Department (SLPD) Officers Nicholas Martorano and John Moton appeal from the district court's[1] judgment, entered upon a jury verdict, finding that they used excessive force in their apprehension and arrest of Calvin Fletcher and awarding damages to Fletcher totaling $600,000. They raise three issues on appeal: (1) the district court erred in allowing Fletcher to read deposition testimony of a medical expert who was not subject to cross-examination at trial; (2) the district court erred in allowing the jury to award punitive damages against Officer Moton without evidence that Officer Moton engaged in any excessive force against Fletcher; and (3) the district court erred in failing to deduct from Fletcher's judgment the amounts that he received from his settlements with other defendants. We affirm.

## I. *Background*

"We view the facts relevant to the controlling issue of law in the light most favorable to the jury's verdict." *Hagen v. Siouxland Obstetrics & Gynecology, PC*, 799 F.3d 922, 924 (8th Cir. 2015).

One evening, Fletcher, a 5'8" African-American male who weighs 155 pounds, was walking to a gas station in St. Louis, Missouri. Fletcher was unarmed and carried no drugs or other contraband. Fletcher saw a marked patrol car leaving the gas

_____

[1]The Honorable Ronnie L. White, United States District Judge for the Eastern District of Missouri.

station's parking lot. SLPD Officers Joseph Tomlinson, Martorano, and Moton were in the patrol car. Fletcher continued walking. He saw the patrol car stop at a stoplight. Fletcher was standing at the corner of the street where the patrol car stopped.

Upon seeing Fletcher, the officers radioed at 8:21 p.m. that they were about to perform a "pedestrian check" on Fletcher. According to the officers, they initiated contact with Fletcher based on his behavior in a vacant lot at the corner of the street. Officer Tomlinson claimed that Fletcher "seemed to be adjusting something in his waistband," which is "[g]enerally . . . a sign of someone carrying a weapon or something on them." Jury Trial Proceedings Transcript, Vol. II, at 166–67, *Fletcher v. Tomlinson*, No. 4:14-cv-00999-RLW (E.D. Mo. Aug. 9, 2016), ECF No. 221. Officer Tomlinson also testified that Fletcher was "visibly startled" by the patrol car. *Id.* at 167. Fletcher walked quickly away from the police, and Officer Tomlinson testified that Fletcher then discarded some type of package from his pockets. Officer Tomlinson described the package as "a chunk of off-white rock-like substance wrapped in plastic, tied at the end. The plastic was knotted." *Id.* at 154. Fletcher, however, testified that he was not in a vacant lot that evening and never threw anything out of his pockets after he noticed the patrol car. In any event, the officers stopped their patrol car, and Officer Tomlinson got out to retrieve whatever Fletcher had allegedly discarded.

Thereafter, the officers sought to detain Fletcher. All the officers left the patrol car and rapidly approached Fletcher. From the patrol car to where Fletcher stood was a few feet. The officers were armed and wearing armored vests. Each was over six feet tall and weighed at least 200 pounds. Startled, Fletcher began backpedaling. He tried to maintain eye contact with the officers, but he glanced back once or twice to see where he was going and to see if something behind him was drawing the officers' attention. Officer Martorano fell as he neared Fletcher, cutting his hand. Officer Moton reached Fletcher first, and Officer Martorano jumped to his feet and ran to Fletcher, too. Fletcher testified that as he was backing up, one of the officers (not

-3-

Officer Martorano) caught up with him, and Fletcher fell on his bottom. After Fletcher fell, the officer came up behind Fletcher and put his hands behind Fletcher's back.

While Fletcher sat on the ground, Officer Martorano, appearing angry, rushed toward Fletcher with his hands up and carrying something in his hand. According to Fletcher, Officer Martorano "smacked [Fletcher] across [his] face" with something that "felt like a brick." *Id.* at 20–21. Fletcher identified "Officers Tomlinson, Martorano[,] and Moton" as the officers who then "started kicking and punching and hitting [him] all over [his] body" as he sat there. *Id.* at 21. Fletcher did not resist the officers. According to Fletcher, "it felt like [the officers were hitting him with] something hard, like a pole or something." *Id.* at 24. He described it as "some kind of rod." *Id.* He felt this object "[o]n [his] lower back, [his] legs." *Id.* According to the police report, Officer Moton was the officer who hit Fletcher with a baton. Officers Moton and Martorano then handcuffed Fletcher and placed him in the backseat of the patrol car.

While in the patrol car, Fletcher saw some bags, a jacket, and a cell phone. He began "screaming and yelling and saying that . . . this stuff is not mine. 'What's going on? What's going on?'" *Id.* at 25. Fletcher feared that the officers were "trying to set [him] up." *Id.* at 26. Fletcher yelled but did nothing to damage the patrol car. Fletcher testified that he yelled briefly. Then, the officers got him out of the patrol car, cursed at him, told him to shut up, and started beating him again. To Fletcher, the beating seemed like it lasted a long time. Fletcher remained handcuffed throughout the encounter. He testified he did not fight back in any way. Fletcher believed there were more than three officers involved in the beating because he "saw . . . a lady [who] had her foot on [his] neck." *Id.* at 27. Toward the end of the beating, Fletcher recalled trying to look back. One of the officers got a jacket and put it over Fletcher's head to block his sight. Then, Fletcher felt an electric shock. Fletcher recalled the officers

hitting him while the female's foot was on his neck. Fletcher believed that he probably lost consciousness because he "can't remember a whole lot." *Id.* at 31.

Not surprisingly, the officers described events from that evening differently than the way Fletcher described them. Once placed in the patrol car, Fletcher, according to the officers, remained combative, thrashing and kicking in the patrol car. This prompted the officers to request a paddy wagon[2] at 8:26 p.m. Officer Jonathan Carroll arrived driving the paddy wagon at 8:29 p.m.[3] According to the officers, they put Fletcher in the paddy wagon soon after it arrived and his "same combative behavior continued." Jury Trial Proceedings Transcript, Vol. III, at 18. Fletcher categorically denied behaving that way.[4]

─────────────

[2]Testimony defined a paddy wagon as "a full-size van with a prisoner cage in the back. It has two seats, a driver's seat and a passenger seat." Jury Trial Proceedings Transcript, Vol. I, at 121, *Fletcher v. Tomlinson*, No. 4:14-cv-00999-RLW (E.D. Mo. Aug. 8, 2016), ECF No. 220. It is used "for transporting arrestees in the City of St. Louis." *Id.*

[3]Sergeant Christopher Simeone was dispatched to the scene at 8:49 p.m. He recalled arriving at the scene prior to the paddy wagon's arrival, but the paddy wagon arrived at 8:29 p.m—20 minutes prior to Sergeant Simeone's dispatched time. Sergeant Simeone claimed he observed Fletcher in the patrol car yelling and causing the car to shake back and forth. Sergeant Simeone testified he opened the door to speak with Fletcher, and Fletcher was "moving about aggressively in the back seat, kind of thrashing about, yelling incoherently." Jury Trial Proceedings Transcript, Vol. III, at 109, *Fletcher v. Tomlinson*, No. 4:14-cv-00999-RLW (E.D. Mo. Aug. 10, 2016), ECF No. 222. Sergeant Simeone testified to seeing Fletcher out of the patrol car when "he was conveyed either to the pa[dd]y wagon or the EMS van." *Id.* at 121.

[4]While the paddy wagon is equipped with cameras, Officer Carroll turned them off when he arrived on the scene. However, the dashboard camera did capture footage upon his arrival to the scene. The dashboard footage shows the officers talking as the paddy wagon arrives. The patrol car's doors are open, and its emergency lights are not on. Fletcher is not seen.

Fletcher does not recall how he got to the paddy wagon. Officer Carroll testified that Fletcher "had to be dragged a little" to the paddy wagon. Jury Trial Proceedings Transcript, Vol. I, at 138. According to Officer Carroll, Fletcher's body was "[p]robably" limp. *Id.* Officer Carroll confirmed that "the officers laid Mr. Fletcher on his side in the pa[dd]y wagon and just sort of pushed him in [it]." *Id.* at 139. Fletcher recalled lying in the paddy wagon and hearing someone talking to him; however, Fletcher was unable to open his eyes. Fletcher then felt another electric shock,[5] which woke him up. He looked up and saw a big light in his face. He closed his eyes again but could still hear talking. Fletcher then looked up and saw a light shining in his face again. He then heard an officer say, "Watch your head." Jury Trial Proceedings Transcript, Vol. II, at 34. Then, according to Fletcher, the door was slammed on his head.

By contrast, the officers reported that as they "were attempting to load [Fletcher] into the back of the [paddy wagon], he became combative once again and kicked [Officer Martorano] in the right knee." Jury Trial Proceedings Transcript, Vol. III, at 15. The officers then "subdued [Fletcher] and loaded [him] into the cruiser." *Id.*

Fletcher was in the paddy wagon when EMTs arrived at 8:58 p.m. The EMTs asked Fletcher if he wanted medical treatment, and Fletcher did not respond. Fletcher does not remember any EMTs speaking with him. The EMT who assessed Fletcher

---

[5]The officers acknowledge that Officer Moton's taser was used twice on Fletcher that evening, but they claim that Officer Martorano fired it and that Officer Moton handed it to Officer Martorano to use. According to the police report, the two taser firings occurred during the first altercation, just before Fletcher was handcuffed. The record showed that three taser firings during Officer Moton's shift. The first was soon after the shift began, at 6:40 p.m. Officer Moton's sergeant confirmed this firing as an expected test-firing time. The other firings were at 8:52 p.m. and 8:56 p.m. The pedestrian-check call on Fletcher occurred at 8:21 p.m. The time span between the pedestrian-check and the second firing is approximately 30 minutes.

testified that "the police signed the refusal [of transport]" to take Fletcher to the hospital. *Id.* at 83. The EMT identified Officer Tomlinson as "the witness to the refusal." *Id.* at 85. The EMTs left at 9:12 p.m.

Officer Carroll then drove Fletcher to the city jail. On arrival, Officer Carroll testified that officers had to hold Fletcher up to enable him to walk inside the jail. According to Officer Carroll, "If they would have let him go, he probably would have just dropped to the ground." Jury Trial Proceedings Transcript, Vol. I, at 140. Fletcher was not under the influence of drugs or alcohol upon his arrival to the jail. Fletcher remained in handcuffs from his initial arrest until they were removed at the jail.

Due to his injuries, Fletcher was in the jail's infirmary for six days. He had a swollen face, pain, abrasions, and bruising all over his body, including his lower back and head. While at the jail, the only medical test conducted was a chest x-ray. Fletcher was then taken to Perry County, Missouri, on a traffic warrant. Fletcher remained in Perry County jail for about a week. Perry County then transported Fletcher to Perry County Memorial Hospital because his condition worsened. Ultimately, Fletcher was taken to St. Louis University (SLU) Hospital. While there, skull x-rays were taken and his creatine levels were checked. A radiology report revealed he had a broken nose, broken eye socket, other facial fractures, and internal brain bleeding. The creatine levels revealed that Fletcher's kidneys were damaged and that he was nearing renal failure. He stayed in SLU Hospital's I.C.U. for two weeks.

Fletcher was charged with drug possession, resisting arrest, and assault on an officer. The rock-like substance that Fletcher allegedly discarded was tested and proved not to be drugs. The prosecuting attorney's office dropped all charges against Fletcher.

Fletcher filed a civil rights action against Officers Carroll, Martorano, Moton, and Tomlinson, the SLPD Board and its members, the City of St. Louis, the contractor operating the jail infirmary ("Corizon"), some of Corizon's employees, the Perry County Sheriff's Department, and the Perry County Memorial Hospital. Fletcher alleged federal and state-law claims of excessive force against each of the four defendant police officers. Fletcher also alleged a claim of conspiracy to violate his Fourth Amendment rights.

On September 29, 2015, defendant Corizon disclosed pursuant to Federal Rule of Civil Procedure 26(a)(2) its retained medical expert Dr. Arnold Berns. Dr. Berns's cover letter revealed that he is board-certified in medicine and nephrology and is familiar with and experienced in all branches and aspects of clinical nephrology, including acute kidney injury, chronic kidney disease, end-stage renal disease, and dialysis. Dr. Berns resides and practices in Chicago, Illinois. Dr. Berns also included his educational, training, and professional experience. Dr. Berns opined that "[t]he proximate cause of Mr. Fletcher's acute kidney injury with associated metabolic complications was traumatic rhabdomyolysis.[6] The rhabdomyolysis occurred at the time of his arrest on March 6 and was due to direct muscle trauma." Plaintiff's Response to Defendant's Objection to the Admission of Any Testimony from the Deposition of Dr. Arnold Berns at 13, *Fletcher v. Tomlinson*, No. 4:14-cv-00999-RLW (E.D. Mo. Aug. 7, 2016), ECF No. 179.

Fletcher's counsel paid for and took the deposition of Dr. Berns on January 13, 2016. Counsel for the officers cross-examined Dr. Berns during that deposition.

---

[6]"[R]habdomyolysis [is] a condition that may occur when muscle tissue breaks down and releases substances into the bloodstream that overwhelm the kidneys. Rhabdomyolysis reportedly can be caused by many factors, including but not limited to drug use or trauma by electrical charge or physical force." *Lash v. Hollis*, 525 F.3d 636, 638 (8th Cir. 2008).

Pursuant to the district court's order, Fletcher served his deposition designations, including the deposition designation for Dr. Berns, on the defendants on July 19, 2016. Twenty days before trial, per the pretrial order, Fletcher filed notice that he "may read the following deposition portions into evidence during his case-in-chief . . . [f]rom the deposition of Dr. Berns." Plaintiff's Designations of Discovery and Depositions at 1, 4, *Fletcher v. Tomlinson*, No. 4:14-cv-00999-RLW (E.D. Mo. July 19, 2016), ECF No. 165. Fletcher also filed a witness list, stating that he "may call . . . Arnold Berns, M.D." Plaintiff's Witness List at 1, *Fletcher v. Tomlinson*, No. 4:14-cv-00999-RLW (E.D. Mo. July 19, 2016), ECF No. 164. The district court's case management order required the defendants to make any objections to the deposition designations at least ten days before trial. The defendants filed no objections to designated parts of Dr. Berns's deposition and filed no cross-designation of the deposition parts.

On August 4, 2016, the defendants learned that Fletcher intended to ask the court for leave to read from the deposition of Dr. Berns, an expert witness previously identified not by Fletcher, but by defendant Corizon, who was no longer a party to the case. On August 5, 2016, the defendants objected to the admission of any out-of-court testimony from Dr. Berns, making six arguments. Defendants argued that (1) Dr. Berns cannot qualify as an expert under the analysis required under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); (2) unless Dr. Berns appears live at trial, the defendants will be deprived of the opportunity to show that Dr. Berns's opinions are inadmissible under *Daubert*; (3) Fletcher did not identify Dr. Berns as an expert witness in his initial disclosures or in response to the discovery requests that the defendants submitted to Fletcher; (4) the defendants learned four days prior to trial that Fletcher had no intention of calling Dr. Berns to testify live at trial but instead intended to read portions of Dr. Berns's deposition transcript, which is inadmissible hearsay under Federal Rule of Evidence 803; (5) such deposition transcript testimony is not admissible under Federal Rule of Evidence 804 because Dr. Berns meets none of the criteria required to qualify as an "unavailable" witness;

and (6) the defendants would be severely prejudiced by admission of the deposition transcript testimony because they have not had a chance to depose Dr. Berns as an expert for Fletcher.

The morning of trial, defense counsel discussed its objection to the introduction of Dr. Berns's deposition testimony with the court. The court asked whether defense counsel was present during Dr. Berns's deposition and whether counsel had the opportunity to cross-examine Dr. Berns. Defense counsel answered yes. The court stated, "I'm going to allow Defendants to use the depo designations that were made to cross-examin[e] anything that Dr. Berns testifies in this trial." Jury Trial Proceedings Transcript, Vol. I, at 15.

Fletcher's counsel then clarified that Fletcher would be relying on Dr. Berns's deposition testimony despite listing him as a "may call" witness. Based on a letter from Dr. Berns, Fletcher's counsel argued that Dr. Berns was "unavailable" under the federal rules. If unavailable, Dr. Berns's deposition would be admissible. In response, defense counsel stated that Dr. Berns had been on the "may call" list and that the defendants did not learn of Dr. Berns's alleged unavailability until four days prior to trial. The district court allowed Fletcher's counsel to present portions of Dr. Berns's deposition but required him to inform defense counsel which parts would be used. The court believed Dr. Berns qualified as an unavailable witness because he was more than 100 miles away and his absence had not been strategically arranged. The case proceeded to trial.

At the close of evidence, the district court granted the defendants a directed verdict on the conspiracy claim. Fletcher then voluntarily dismissed all of his state-law claims, leaving only his federal § 1983 claims. Over the defendants' objection, the district court submitted an instruction to the jury permitting it to return a verdict for punitive damages against Officer Moton.

The jury found in favor of Officers Tomlinson and Carroll and against Officers Martorano and Moton. On each of the claims against Officers Martorano and Moton, the jury awarded compensatory damages of $100,000 and punitive damages of $200,000.

Officers Martorano and Moton filed various post-trial motions, including a motion for new trial based upon the alleged erroneous admission of Dr. Berns's deposition testimony; a motion for judgment as a matter of law based upon the alleged lack of evidence against Officer Moton; and a motion to amend the judgment based upon the alleged failure to deduct the amounts that Fletcher received from his settlements with Corizon and Perry County.

Relevant to this appeal, the court found no basis for granting a new trial, concluding that Dr. Berns was disclosed as a witness by Corizon and was cross-examined thoroughly by defense counsel. The district court found that Dr. Berns was unavailable under Federal Rule of Civil Procedure 32(a) pursuant to the letter from Dr. Berns's Chicago office stating that he would be practicing medicine in Chicago. In addition, the court noted that Fletcher putting Berns on the "may call" list did not preclude Fletcher from using his deposition, which was clearly identified in Fletcher's deposition designations. The court also held that the defendants could not argue post-trial that Dr. Berns was unqualified to provide expert testimony when they never filed a *Daubert* motion challenging his qualifications. The court found that the defendants had waived the issue.

The court also addressed Officers Moton and Martorano's motions to alter or amend the judgment based on their objection at trial to the submission of Fletcher's claims for punitive damages and to the jury instructions on punitive damages. The court held that the defendants failed to show a sufficient basis for altering or amending the judgment because the jury clearly believed Fletcher's version of events with respect to Officers Moton and Martorano. That verdict reflected a finding of

malice, recklessness, or callous indifference to Fletcher's right to be free from excessive force. The court found sufficient evidence of malice, recklessness, or callous indifference to support the verdict based upon Fletcher's extensive injuries and the testimony that he was beaten even after he complied with the officers' requests and after he was handcuffed. The court noted the jury's reliance upon expert witness testimony that Fletcher's injuries were caused by the actions of Officers Moton and Martorano. As a result, the jury had a reasonable basis for awarding punitive damages to Fletcher.

The court awarded Fletcher $21,898.03 in expenses and awarded Fletcher 55 percent of his requested attorneys' fees ($164,071.88).

## II. *Discussion*

On appeal, Officers Martorano and Moton argue: (1) the district court erred in allowing Fletcher to read Dr. Berns's deposition testimony at trial; (2) the district court erred in allowing the jury to award punitive damages against Officer Moton without evidence that Officer Moton engaged in any excessive force against Fletcher; and (3) the district court erred in failing to deduct from Fletcher's judgment the amounts that he received from his settlements with other defendants.

### A. *Expert Testimony*

"We review the denial of a motion for a new trial for a clear abuse of discretion, with the key question being whether a new trial is necessary to prevent a miscarriage of justice." *Manning v. Jones*, 875 F.3d 408, 410 (8th Cir. 2017) (citation omitted), *cert. denied*, 138 S. Ct. 1707 (2018). "The decision to admit deposition testimony will not be reversed absent a clear showing the trial court abused its discretion." *Nationwide Mut. Fire Ins. Co. v. Dunkin*, 850 F.2d 441, 443 (8th Cir. 1988) (per curiam) (citation omitted).

Officers Martorano and Moton make four arguments in support of their contention that the district court abused its discretion in allowing Fletcher to read Dr. Berns's deposition testimony at trial: (1) Dr. Berns's deposition testimony was inadmissible because they were never allowed to cross-examine Dr. Berns at trial or as an expert witness for Fletcher; (2) Dr. Berns's out-of-court testimony was inadmissible because Fletcher failed to show that Dr. Berns was "unavailable" under Federal Rule of Evidence 804(a)(5); (3) Fletcher did not show that Dr. Berns was qualified to render his opinions based solely upon a review of some unidentified medical records; and (4) Fletcher deprived the officers of a fair trial and prejudiced them by not producing Dr. Berns for cross-examination and impeachment at trial. We consider each argument in turn.

### 1. *Cross-examination*

Officers Martorano and Moton argue that Dr. Berns's deposition was inadmissible because they never had the opportunity to cross-examine Dr. Berns at trial or as an expert witness for Fletcher. In support of this argument, they assert that (1) Fletcher never identified Dr. Berns during discovery, (2) Fletcher did not identify Dr. Berns after discovery closed, and (3) they were denied their right to cross-examine Dr. Berns either at trial or as an expert for Fletcher.

The officers' argument flies in the face of unyielding facts. The record shows that on September 29, 2015, defendant Corizon notified all parties that Dr. Berns was its retained expert witness. The officers do not dispute that in January 2016, Fletcher's counsel served on defendants' counsel a "Supplemental Disclosure of Experts" in which Fletcher stated that he might rely on Dr. Berns's testimony. On January 13, 2016, Fletcher's counsel—not Corizon—paid for and took the deposition of Dr. Berns. Counsel for the officers extensively cross-examined Dr. Berns during that deposition.

-13-

The district court set trial for August 8, 2016. The district court ordered the parties to designate any deposition testimony that they intended to read into evidence 20 days prior to trial and to file any objection to such testimony ten days prior to trial. In accordance with the district court's pretrial order, on July 19, 2016, Fletcher filed his deposition designations. Specifically, Fletcher provided that he "may read the following deposition portions into evidence during his case-in-chief" and included "the deposition of Dr. Berns" with the designated portions of that deposition. Plaintiff's Designations of Discovery and Depositions at 1, 4.[7] The officers did not object ten days before trial in accordance with the pretrial order; instead, they waited until August 5, 2016, the last business day before trial, to file any objection. The officers argued that they were notified the day prior that Fletcher intended to read from Dr. Berns's deposition instead of producing Dr. Berns as a live witness at trial. The court overruled this objection. After the district court permitted Fletcher to introduce parts of Dr. Berns's deposition into the record, the officers' counsel read the prior cross-examination of Dr. Berns to the jury at trial.

Based on the record, we conclude that the officers were not deprived of an *opportunity* to cross-examine Dr. Berns for trial purposes for three reasons. First, the officers had the opportunity to cross-examine Dr. Berns during his deposition on January 13, 2016, and extensively did so. Second, Fletcher notified the officers in accordance with the pretrial order that he "may read" designated portions of Dr. Berns's deposition at trial. The officers had ten days following Fletcher's designation to object; they chose not to object. Third, the court permitted the officers' counsel to

---

[7]Fletcher separately filed a witness list. Fletcher indicated that he "may call" Dr. Berns. Plaintiff's Witness List at 1. This designation can be contrasted with two other witnesses that Fletcher indicated that he "intend[ed] to call" at trial. *Id.*

-14-

read the prior cross-examination of Dr. Berns to the jury at trial.[8] Their argument that they were deprived of their right to cross-examine Dr. Berns at trial fails.

## 2. *Unavailable*

The officers next argue that Dr. Berns's out-of-court testimony was inadmissible because Fletcher did not show—and the district court failed to find—that Dr. Berns was "unavailable" under Rule 804(a)(5). Specifically, the officers contend that Fletcher failed to show that he could not procure Dr. Berns's attendance by "other reasonable means." Fed. R. Evid. 804(a)(5).

We begin with Federal Rule of Civil Procedure 32(a)(4)(B), which provides that

> [a] party may use for any purpose the deposition of a witness, whether or not a party, if the court finds . . . that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition.

We hold that Rule 32(a)(4)(B) gave the district court discretion to admit Dr. Berns's deposition testimony because he was more than 100 miles away from the trial, and Fletcher did not procure his absence. Decisions from around the country have concluded that Rule 32(a)(4)(B) operates as an independent exception to the hearsay rule.[9] We agree.

---

[8]Because we conclude that the officers were not deprived of their *opportunity* to cross-examine Dr. Berns for trial purposes, we need not address whether they were deprived of a fair trial or prejudiced by Dr. Berns's absence from the trial.

[9]"Our sister circuits have recognized that Rule 32(a) is an independent exception to the hearsay rule." *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 914 (9th Cir. 2008) (citing *Ueland v. United States*, 291 F.3d 993, 996 (7th Cir. 2002) ("Rule 32(a), as a freestanding exception to the hearsay rule, is one of the 'other

As a result, a deponent whose "testimony properly was admitted under Rule 32(a)(4)(B) . . . need not also meet the requirements for admissibility set forth in [Federal Rule of Evidence] 804(b)(1)."[10] *Richards*, 541 F.3d at 914. Federal Rule of

_____

rules' to which Fed. R. Evid. 802 refers. Evidence authorized by Rule 32(a) cannot be excluded as hearsay, unless it would be inadmissible even if delivered in court."); *Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 962–63 (10th Cir. 1993) ("Deposition testimony is normally inadmissible hearsay, but Fed. R. Civ. P. 32(a) creates an exception to the hearsay rules."); *S. Ind. Broad., Ltd. v. FCC*, 935 F.2d 1340, 1341–42 (D.C. Cir. 1991) (acknowledging that Rule 32(a) creates an exception to the hearsay rule); *United States v. Vespe*, 868 F.2d 1328, 1339 (3d Cir. 1989) (stating that Rule 32(a)(4)(B) "constitutes an independent exception to the hearsay rule"); *Carey v. Bahama Cruise Lines*, 864 F.2d 201, 204 n.2 (1st Cir. 1988) (stating that Rule 32(a)(4)(B) "is more permissive than Federal Rule of Evidence 804(a)(5)")).


[10]Federal Rule of Evidence 804(b) sets forth the exceptions that "are not excluded by the rule against hearsay if the declarant is unavailable as a witness." Specifically, subsection 804(b)(1) provides that former testimony is an exception to the hearsay rule if that testimony

> (A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and

> (B) is now offered against a party who had—or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

Federal Rule of Evidence 804(a) sets forth the criteria for being unavailable. The officers rely on subsection 804(a)(5), which provides that

> [a] declarant is considered to be unavailable as a witness if the declarant . . . is absent from the trial or hearing and the statement's proponent has not been able, *by process or other reasonable means*, to procure:

> (A) the declarant's attendance, in the case of a hearsay exception under Rule 804(b)(1) or (6); or

Evidence 802 provides that "hearsay is admissible where allowed by the Federal Rules of Evidence, or 'by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress.'" *Id.* (quoting Fed. R. Evid. 802). "Rule 32(a)(4)(B) is one of these 'other rules.'" *Id.* (quoting Fed. R. Evid. 802 advisory committee's notes)). "Rule 804 is irrelevant to [the] analysis" of admission of deposition testimony under Rule 32(a)(4)(B). *Id.* at 915. *But see Lehman Bro. Holdings, Inc. v. Nat'l Bank of Ark.*, 875 F. Supp. 2d 911, 922 (E.D. Ark. 2012) ("The party seeking to admit the deposition must prove that the requirements of both Rule 32(a)([4]) and Rule 804(b)(1) have been met. . . . " (quoting *In re Air Crash*, 720 F. Supp. 1493, 1502 (D. Co. 1989))).

Here, the record reflects that on August 4, 2016, Dr. Berns wrote and submitted a letter to the officers' counsel advising that he was unavailable for trial "during the time period of August 8, 2016[,] through August 12, 201[6,] because [he would] be busy in Chicago practicing medicine at [his] medical practices." Plaintiff's Response to Defendant's Objection to the Admission of Any Testimony from the Deposition of Dr. Arnold Berns at 7. Given that the trial would take place in St. Louis, Missouri, this satisfies Rule 32(a)(4)(B)'s requirement that the witness be "more than 100 miles from the place of . . . trial." The officers have produced no record evidence to show that Fletcher procured Dr. Berns's absence. *See id.*

The officers also argue that the district court failed to make an express finding that Dr. Berns was "unavailable." Because the district court failed to make an express finding of unavailability, the officers contend, Dr. Berns's deposition opinion is

---

(B) the declarant's attendance or testimony, in the case of a hearsay exception under Rule 804(b)(2), (3), or (4)."

(Emphasis added.)

-17-

inadmissible hearsay that should not have been read to the jury at trial. The officers' argument is directly contradicted by *Dunkin*. In that case, the appellant argued that the district court erred by admitting the deposition testimony of her attorney. 850 F.2d at 443. The district court observed that the appellant's attorney was not available because he was required to appear in another case in another city on the same day. *Id.* Both parties agreed that the city in question was more than 100 miles from the place of the trial; however, the appellant argued that the district court failed to "make a specific finding to that effect" under Rule 32(a)(4)(B). *Id.* This court held, "By admitting the deposition of [the appellant's] attorney, however, the court *implicitly found* the conditions of rule 32(a)([4])(B) had been satisfied." *Id.* (emphasis added) (citation omitted). Therefore, the court found "no abuse of discretion in the district court's admission of the deposition." *Id. Dunkin* stands for the proposition that no express finding is required.

Here, the district court made a finding that the conditions of Rule 32(a) were satisfied based on Dr. Berns's letter dated August 4, 2016, that he was "unavailable to attend trial in Missouri during the time period of August 8, 2016[,] through August 12, 201[6,] because [he would] be busy in Chicago practicing medicine at [his] medical practices." Plaintiff's Response to Defendant's Objection to the Admission of Any Testimony from the Deposition of Dr. Arnold Berns at 7. Dr. Berns stated that he "live[s] in the Chicago area and [is] generally not available to attend trial in St. Louis, MO." *Id.* On the first day of trial, the district court noted that Dr. Berns had "filed a letter that's part of the record of the court that indicates he can't be here because he's practicing medicine." Jury Trial Proceedings Transcript, Vol. I, at 17. Based on *Dunkin*, the district court's admission of the deposition and acknowledgment of this letter was sufficient. It did not have to expressly state on the record that it was finding Dr. Berns "unavailable."

### 3. *Qualified Expert*

The officers argue that Fletcher made no showing that Dr. Berns was qualified to render his opinions based solely upon a review of some unidentified medical records. The officers point out that Dr. Berns was the expert witness for Corizon, not Fletcher. According to the officers, neither Corizon nor Fletcher ever made a showing of Dr. Berns's qualifications.

On September 29, 2015, defendant Corizon disclosed Dr. Berns as its retained expert pursuant to Federal Rule of Civil Procedure 26(a)(2). On November 24, 2015, the district court issued a memorandum and order on Fletcher's motion to amend the case management order. That order provided, in relevant part, that "any motion to exclude testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)[,] or *Kuhmo Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999), must be filed no later than January 15, 2016." Memorandum and Order at 2, *Fletcher v. Tomlinson*, No. 4:14-cv-00999-RLW (E.D. Mo. Nov. 24, 2015), ECF No. 113 (bold omitted).

Fletcher's counsel paid for and took the deposition of Dr. Berns on January 13, 2016. Counsel for the police officers extensively cross-examined Dr. Berns during that deposition.

As the district court pointed out, "Defendants never filed a *Daubert* motion challenging [Dr. Berns's] qualifications. Likewise, Defendants did not raise this issue before the Court when Defendants addressed the testimony of Dr. Berns immediately before the trial." Memorandum and Order at 7, *Fletcher v. Tomlinson (Fletcher II)*, No. 4:14-cv-00999-RLW (E.D. Mo. Oct. 14, 2016), ECF No. 219 (hereinafter, "*Fletcher II*"). As a result, the district court concluded that the defendants had "waived the right to assert that Dr. Berns was unqualified." *Id*.

-19-

On appeal, the officers argue that they did not waive their objection to the hearsay opinion of Dr. Berns because they objected as soon as Fletcher disclosed that, rather than produce Dr. Berns for cross-examination at trial, he would instead attempt to read Dr. Berns's deposition opinions into evidence. This belated objection has nothing to do with Dr. Berns's *qualifications*. Like the district court, we conclude that the officers waived their *Daubert* challenge to Dr. Berns's qualifications because the deadline was January 15, 2016, and the officers did not submit a *Daubert* challenge to Dr. Berns by this deadline.

In summary, we conclude that the district court did not abuse its discretion in admitting Dr. Berns's deposition testimony. *See Dunkin*, 850 F.2d at 443.

B. *Punitive Damages*

Officer Moton argues that the district court erred in submitting Fletcher's punitive damages claim against him to the jury because Fletcher produced no evidence showing that he used excessive force, acted with malice or racial bias, or caused any of Fletcher's injuries. First, Officer Moton asserts that no evidence at trial shows that he used excessive force against Fletcher because Fletcher never identified him as one of the officers who attacked or injured him during the arrest. Officer Moton contends that Fletcher testified that the officers who attacked him were white, while Officer Moton is black. He also maintains that Fletcher identified Officer Martorano as the officer who hit him. Finally, Officer Moton cites evidence that he held Fletcher only around his legs, where Fletcher sustained no injuries. Second, Officer Moton maintains that no evidence at trial shows that he caused any of Fletcher's injuries. Again, he asserts that Fletcher identified Officer Martorano as the officer who injured him. Furthermore, the expert witnesses did not identify any injuries to Fletcher's lower body, where Officer Moton handled Fletcher. In the absence of evidence that he used excessive force against Fletcher, Officer Moton argues that the district court erred in submitting a punitive-damages instruction to the

jury. The district court rejected these same arguments in the officers' motion to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e).

"We accord a district court broad discretion in determining whether to grant a motion to alter or amend judgment, and we will not reverse absent a clear abuse of discretion." *Burckhard v. BNSF Ry. Co.*, 837 F.3d 848, 857 (8th Cir. 2016) (per curiam) (citation omitted), *reh'g denied* (Oct. 19, 2016).

If a plaintiff's underlying claim fails, then a plaintiff's claim "for punitive damages necessarily fail[s]." *Schaffer by Schaffer v. A.O. Smith Harvestore Prod., Inc.*, 74 F.3d 722, 731 (6th Cir. 1996). "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, 'the test is whether the amount of force used was objectively reasonable under the particular circumstances.'" *Littrell v. Franklin*, 388 F.3d 578, 583 (8th Cir. 2004) (quoting *Greiner v. City of Champlin*, 27 F.3d 1346, 1354 (8th Cir. 1994)). "The question for the jury is whether, judging from the perspective of a reasonable officer at the scene of the arrest, the totality of the circumstances justifies the use of the force used." *Id.* at 584 (quoting *Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1081 (8th Cir. 1990)).

Here, we conclude that the district court properly submitted the issue of excessive force to the jury, and the jury found that the officers, including Officer Moton, violated Fletcher's constitutional right to be free from excessive force. *See id.* As the district court explained, "The jury clearly believed [Fletcher's] version of events with respect to *Defendants Moton* and Martorano." *Fletcher II* at 11 (emphasis added). Fletcher testified that he did not resist the officers or give them any reason to use force.

First, the evidence sufficiently establishes that *Officer Moton* used excessive force against Fletcher. Fletcher specifically identified "Officers Tomlinson, Martorano, *and Moton*" as the officers who "started kicking and punching and hitting

-21-

[him] all over [his] body." Jury Trial Proceedings, Vol. II, at 21. Fletcher described being hit with "some kind of rod . . . [o]n [his] lower back, [his] legs." *Id*. at 24. Officer Moton was the officer who hit Fletcher with a baton, as confirmed in the police report, Officer Moton's testimony, and Officer Tomlinson's testimony.[11]

Second, the evidence sufficiently establishes that Officer Moton caused Fletcher's injuries. Officer Moton hit Fletcher with the baton. Fletcher testified that he was hit with a rod-like instrument on his "lower back." *Id.* at 24. Dr. Arkin testified that Fletcher had a "linear wound" that could have been caused by "a linear object" such as "a baton or a rod of some sort." Jury Trial Proceedings Transcript, Vol. I, at 74. Fletcher's linear bruising appeared on his back, and it "was noted by the professionals that were at The Justice Center." *Id.* Dr. Arkin explained that the kidneys are "located down in the torso near where [Fletcher's] injury was." *Id.* In other words, Dr. Arkin confirmed that Fletcher's kidneys were located in "the same general area where the linear or line bruising was." *Id.* at 74–75. Dr. Arkin's opinion was that "the trauma to [Fletcher's] torso, to [his] back, . . . caused kidney failure." *Id.* at 88.

Because Fletcher's excessive-force claim is supported by sufficient evidence, we next address whether sufficient evidence supports the jury's award of punitive damages against Officer Moton. *See Schaffer by Schaffer*, 74 F.3d at 731. "Punitive damages may be awarded under 42 U.S.C. § 1983 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Schaub v. VonWald*, 638 F.3d 905, 922 (8th Cir. 2011) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).

---

[11]Officer Moton testified that he "pulled [his] ASP [(baton)] out and [he] hit [Fletcher] on the *back of the leg*." *Id.* at 220 (emphasis added). Thus, he admits to using the baton, but he contests where he hit Fletcher with it. Officer Tomlinson confirmed that "[Officer] Moton was the one who was hitting [Fletcher] with the baton." *Id.* at 123.

The purpose of punitive damages is to "punish a defendant for outrageous, intentional, or malicious conduct, and deter similar extreme conduct in the future." *Id*. at 922–23 (citations omitted). "[W]hether a defendant's conduct was motivated by an evil motive or involves reckless indifference to the federally protected rights of others" "is a question of fact." *Id*. at 923 (citation omitted). We agree with the district court that

> there was sufficient evidence of malice, recklessness or callous indifference to support this verdict based upon the extensive injuries suffered by [Fletcher], as well as his testimony that he was beaten after he complied with the officers and after he was handcuffed. The jury also relied upon the expert witness testimony that [Fletcher's] injuries were caused by the actions of [Officers] *Moton* and Martorano. Based upon all of the foregoing, the jury had a reasonable basis for awarding punitive damages to [Fletcher].

*Fletcher II* at 11–12.

## C. *Deducting Settlement Amount*

Finally, Officers Martorano and Moton argue that the district court neglected to deduct from the judgment amount the sums that Fletcher received from the pretrial settlements with other defendants.

The record shows that a week prior to trial, on July 29, 2016, Fletcher's counsel notified the officers' counsel that "Perry County paid . . . to settle the case and the Corizon Defendants paid . . . to settle the case. It is our understanding that these numbers and settlements are confidential and are protected from disclosure in writing or orally to other parties." Add. at A022. At no time prior to trial or during trial did the officers bring these settlements or the issue of offset to the district court's attention. Only after trial did the officers ask to reduce any actual damages by the

-23-

settlement amounts via a Rule 59(e) motion to alter or amend the judgment. That motion provided, in relevant part:

> Pursuant to a settlement with Corizon, Inc. and other former defendants in this case, Plaintiff has received payment of substantial sums toward his actual damages. By agreement between counsel, the parties have kept the settlement amounts confidential, and, with the Court's permission, a memorandum will be filed under seal advising the Court of the settlement amount by which the Judgment should be reduced.
>
> WHEREFORE, Officer John Moton and Officer Nicholas Martorano each prays that the Court amend the Judgment by subtracting from the Judgment the amounts that Plaintiff has received by way of settlements and that the Court also eliminate and/or reduce one or both of the awards of punitive damages that the jury awarded in their verdicts.

Motion to Alter or Amend the Judgments at 1–2, *Fletcher v. Tomlinson*, No. 4:14-cv-00999-RLW (E.D. Mo. Sept. 7, 2016), ECF No. 205.

In their memorandum in support of their Rule 59(e) motion, the officers did not mention their offset argument. In its memorandum and order, the district court did not address this aspect of the officers' Rule 59(e) motion.

> Federal Rule of Civil Procedure 59(e) was adopted to clarify a district court's power to correct its own mistakes in the time period immediately following entry of judgment. Rule 59(e) motions serve a limited function of correcting "'manifest errors of law or fact or to present newly discovered evidence.'" Such motions cannot be used to introduce new evidence, tender new legal theories, or raise arguments which could have been offered or raised prior to entry of judgment. A case in which a timely Rule 59(e) motion has been filed lacks finality because the motion tolls the time limitation for appeal in order to

provide the trial court with jurisdiction to resolve the motion. This "tolling process" encourages "both correctness and finality."

*Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills*, 141 F.3d 1284, 1286 (8th Cir. 1998) (citations omitted).

Here, the officers were using Rule 59(e) to introduce a new legal argument not previously raised before the district court—the legal argument that the settlement amounts should be reduced from any actual damages awarded. Rule 59(e) cannot be so used. *See id*. For that reason, the district court did not err in declining to address the issue, and we affirm the district court's denial of the officers' Rule 59(e) motion on this ground.

### III. *Conclusion*
Accordingly, we affirm the judgment of the district court.

_____